**HIGH VOLTAGE ENGINEERING COR-
PORATION, a Corporation, Appellant,**

v.

**C. Ballard PIERCE and Sandia Corpora-
tion, a Corporation, Appellees.**

**No. 8071.**

United States Court of Appeals
Tenth Circuit.

March 29, 1966.

Rehearing Denied April 27, 1966.

———◆———

Bryan G. Johnson, Albuquerque, N. M. (Marshall G. Martin, Albuquerque, N. M., with him on brief), for appellant.

George Harris, Jr., and Allen C. Dewey, of Modrall, Seymour, Sperling, Roehl & Harris, Albuquerque, N. M. (Rodey, Dickason, Sloan, Akin & Robb and T. M. Gemberling, Albuquerque, N. M., with them on brief), for appellees.

Before MURRAH, Chief Judge, PICKETT, Circuit Judge, and LANGLEY, District Judge.

MURRAH, Chief Judge.

This appeal is from a judgment on a jury verdict in an action by appellee Pierce against appellant High Voltage for personal injuries caused by a radioactive beam from an electron accelerator manufactured and supplied by High Voltage to the intervenor Sandia Corporation,[1] Pierce's employer.

The Van deGraaff two million volt accelerator was designed and used to propel electron beams at target material for nuclear experimental purposes. This is accomplished by spraying electrons on a moving belt for transmission to a high voltage terminal. From the terminal they flow to a cathode for emission into the accelerator tube and propulsion to the experiment target at the end of the tube. Four switches control the accelerator's operation. One switch turns on the power and another controls the belt and its drive motor. A third switch determines the amount of voltage on the terminal. Another, the beam switch, allows the electrons to be emitted as a beam from the cathode into the accelerator tube. The electron beam causes radiation and potential human danger in the target area.

The accelerator is housed in a concrete chamber or "target room". On the date of the accident, a Sandia Corporation employee, trained by appellant, was operating the drive motor and belt to dispel a 1,700,000 volt "self-charge" on the voltage terminal. The beam switch was off. The appellee-Pierce asked the operator if it was safe to enter the accelerator chamber to set up an experiment. After being told it was safe because the beam switch was off, Pierce entered the chamber despite the blinking of warning lights and a sounding horn indicating that the drive motor was operating. Two minutes later he left the room and discovered the injuries complained of.

The theory of appellees' case as correctly submitted to the jury is that a radioactive beam referred to as "dark current phenomenon" was emitted from the accelerator tube while the beam switch was off and the accelerator was in a condition of self-charge at high voltage. The court defined the issues by telling the jury that the accelerator was a dangerous instrumentality when emitting an electron beam; that it could and did emit an electron beam under the conditions prevailing at the time the appellee was injured; and that High Voltage knew that this phenomenon could occur. The issues were further sharpened by stating the contention of appellees to the effect that they did not know of the phenomenon and High Voltage was, therefore, under a duty to give adequate warning of the attendant danger. The trial court then succinctly stated the appellant's contention to the effect that it was under no duty to warn the appellees of the particular danger because as scientists they knew or should have known of it. Moreover, if they did not know, they had been given adequate

---

1. The Sandia Corporation intervenes as a self-insurer who has paid benefits under the Workman's Compensation laws.

warning of the particular hazard, and entry into the chamber under the prevailing circumstances was contributorily negligent.

The trial court then proceeded to state the applicable law of the case to the effect that as the supplier of a dangerous instrumentality the appellant was under a legal duty to warn prospective users of dangers which it knew or should know, and that such warning should be commensurate with the degree of danger involved, i. e. the warning must be directed to the specific danger and sufficient to cause a reasonable man acting under similar circumstances with the same knowledge and background to know the potential danger involved in the exercise of reasonable care.

The appellant makes no objection to the statement of the issues or the law of the case as stated in the trial court's instructions. It takes the position, however, that the trial court should have followed the law and the ruling in Marker v. Universal Oil Products Co., 10 Cir., 250 F.2d 603, and directed a verdict on the grounds that the evidence conclusively shows that the peculiar danger causing the injury was equally within the knowledge of the parties and the appellant was, therefore, under no duty to warn or inform. Alternatively, it contends that as a matter of law its legal duty was fulfilled by complete and adequate instructions to any user of the accelerator and that the harm in this case resulted from an unanticipated misuse by an adequately informed user.

■ The directed verdict in Marker was sustained on the conclusiveness of the proof that the dangerous condition was equally within the technical knowledge of both parties and that the harm, therefore, resulted from an unanticipated misuse. If the appellee had equal knowledge of the danger involved, or if he was adequately informed of it, his subsequent entry into the chamber would constitute unanticipated misuse or contributory negligence, both barring recovery. See Marker v. Universal Oil Prod-

ucts Co., supra; Parkinson v. California Co., 10 Cir., 255 F.2d 265.

■ The court in our case gave no equal knowledge instruction, and the appellant does not complain of its failure to do so. But, if, as in Marker, the evidence conclusively shows equal technical knowledge of the danger, High Voltage was entitled to a directed verdict under applicable law. Unlike Marker, however, we do not think the proof in our case conclusively shows equal technical knowledge of the dark current phenomenon which admittedly caused the danger and consequent harm.

We, of course, judge the critical question of equal knowledge or adequate notice in the context of an instrumentality specially designed for experimental use by highly skilled operators and physicists. In this environment it is suggested that while the users of this particular instrument, including these appellees, may not have actually known of the dark current phenomenon in accelerators like this one, it was within the realm of their technical or scientific knowledge, and they should have known it could occur under prevailing conditions, i. e. self-charge at high voltage.

True, as scientists the appellees or those with similar knowledge may have known of the scientific principle of dark current phenomenon, but the evidence does not conclusively show that appellees or anyone with similar scientific or technical knowledge knew or had reason to believe that this accelerator might produce the dark current phenomenon under prevailing conditions. There was some evidence that the phenomenon in accelerators of this type was not generally known among physicists; that a paper had been written on the subject but had been read to a very small group and had not received wide circulation. The Director of Physical Research at Sandia, who was completely familiar with accelerators, testified that he was aware of the principle of dark current phenomenon, but that he was not aware of the scientific fact that it could occur in this

particular accelerator.[2] Appellee Pierce testified he did not know about it; the operator denied he knew of it; another scientist who had been similarly injured testified that he did not know of it or of anyone who did. The issue of equal scientific knowledge was well within the realm of fact.

Alternatively, High Voltage cites seven specific instances of unanticipated gross misuse of the accelerator based upon adequate notice, any one of which would bar recovery. Five of the cited instances are based upon failure to heed specific warnings contained in the manual of instructions accompanying delivery of the accelerator.[3] There was conflicting proof concerning the meaning and significance of four of the warnings in the instruction manual, and the jury was correctly instructed that " * * * any ambiguity in the language of a warning furnished in connection with a product such as the machine in question * * * must be construed against the manufacturer who selected the words used."

The fifth asserted warning contained in the manual under the heading "Radiation Hazard" stated that "The output from the high voltage accelerator tube of this apparatus can produce radiation effects with serious and possibly fatal consequences to personnel. To minimize radiation hazards, adequate radiation protection and monitoring equipment must be provided before this equipment is operated. Frequent checks are essential." A similar warning was contained in the pre-installation instructions and stated "(6) Radiation Detection Devices Required". Two different devices were specified for detection and metering of radiation, i. e., a hand meter and a remote meter. Similar instructions were also given in a letter promulgated by the Health Physics Section of Sandia in consultation with its Physical Research Section. The effect of all these instructions was to require the installation of a remote monitoring system whereby a detector was installed inside the target room with a count-rate meter in the console room on the outside. This monitor was supposed to enable anyone at the console to determine and measure any radiation in the target room. The remote meter was installed but was inoperative on the date of the accident. The explanation was that when the accelerator was operating at full power the intense radiation produced within the target room " * * * caused the meter to malfunction so that it didn't operate properly."

2. On direct examination Dr. Claassen testified as follows: "Q. The self-charging process, is that to be distinguished in any way from this dark current that you spoke of? A. Yes, those two phenomena are entirely separate. Q. What do you mean by that? A. This self-charge has reference to charge which is being carried on this belt up through this high-pressure gas I mentioned earlier. The dark current we have referred to takes place within the vacuum space in the accelerator tube, so to me those two currents are entirely different."

On cross-examination he testified as follows: "Q. As a physicist do you not know that it is a matter of common knowledge among physicists and electrical engineers that electron emissions from an accelerator tube can be produced with high voltage and a vacuum tube, without any question of this cathode emission? A. I would state this: It is possible to design a configuration, a geometric or a particular shape such that high voltage and a vacuum will produce the emission of electrons. On the other hand, I would not represent it as common knowledge amongst physicists or other technical people that any combination of high voltage and high vacuum would produce a sizable current of electrons.

3. Four of the warnings read as follows: (1) "Radiation Hazard The output from the high voltage accelerator tube of this apparatus can produce radiation effects with serious and possibly fatal consequences to personnel." (2) "The output of the generator can be destructive to human life. No person should be permitted in the generator room while the generator is in operation." (3) "Observe all *high voltage* and *radiation signs*." (4) "Do not remain in the generator room when the drivemotor is running, or perform any maintenance on the column until *you have grounded the high voltage terminal to the ground plate*."

Another misuse was claimed for failure of Pierce to take a hand survey meter (a geiger-counter) into the target room with him in accordance with the safety instructions promulgated by Sandia. The testimony was to the effect that the hand survey meter was required and that the operator of the accelerator had been instructed to always take the meter into the room when doing maintenance work on the accelerator, whether the beam switch was on or off. There was also evidence to the effect that Pierce knew of the hand meter and its purpose and that he did not take it into the target room with him and was not instructed to do so by the operator. The operator first indicated that if Pierce had taken the hand meter into the target room the accident would not have happened. Upon reflection, he indicated that because of the time it took the meter to register radiation the accident might have happened in any event. Pierce testified that if there had been any question of safety, he would not have gone into the target room or would have taken a meter with him; that he did not realize the danger under the circumstances because he knew the beam switch was off.

High Voltage takes the position that even if Pierce was not guilty of misuse or contributory negligence, Sandia was negligent and such negligence was the sole cause of the injury, first, for failure to promulgate proper safety rules for the operation of the machine and, second, failure to observe and enforce the safety rules it did promulgate, namely the proper use of both the remote metering system and the hand survey meter.

Judge Payne thought these defenses presented questions of fact under the evidence and told the jury that the warnings, if any, in the instruction manual would be binding upon Pierce only if he knew about them or should have known in the exercise of due care, but if the warnings were adequate they were binding upon Sandia in any event and it was under a duty to pass them on to its employees, including Pierce; that the jury should determine whether the instruc-

tions did contain warnings and, if so, whether they were adequate and whether Sandia passed them on to Pierce; that they should make this determination in determining whether Sandia was negligent and whether its negligence, if any, was the sole and proximate cause of the accident.

The seventh claimed misuse of the machine has to do with Dr. Pierce's entry into the target room in disregard of the door interlocks and the audible, visual warnings, i. e. flashing lights and sounding horn. The horn blows for forty-five seconds after entry into the target room when the power is on even though the beam switch is off, and the lights continue to flash as long as the drive motor is in operation. When Pierce went to the operator in the console room outside the target room, the drive motor was in operation, the beam switch was off and the lights were flashing. When he entered the target room through the interlocking doors the drive motor and flashing lights automatically stopped. When the doors were closed, the operator turned the drive motor on and the lights began to flash and the horn began to blow. The lights continued to flash after the horn was silent. The Director of Research testified that the purpose of the warning lights and horn was to alert anyone inside the target room that someone was at the console and had started the drive motor, and that he ought to find out "why they had turned on the switches". Dr. Pierce testified that he did not heed the warning because he already knew the operator was at the console and the drive motor was in operation, but that the beam switch was off, hence no danger of radiation.

High Voltage contends that Pierce was negligent in entering the room in these circumstances and that in any event Sandia was solely negligent by failing to prohibit Pierce from entering the target room under prevailing conditions; that the interlocking doors, horn and flashing lights were clear warning to anyone.

Judge Payne submitted this issue to the jury instructing them to determine

from all the evidence and surrounding circumstances whether these warnings were sufficient to adequately warn a reasonable man in the exercise of ordinary care. On both the motion for directed verdict and motion for judgment n. o. v. Judge Payne was deeply disturbed and perplexed concerning whether as a matter of law the warning signals were adequate in and of themselves to inform Sandia and Pierce of the peculiar danger which prevailed at the time of the accident and which caused the harm. He was impressed with the significance of the words on the console panel: "Radiation Beam" "On" "Off" and seemed to think the operator may have been lulled into the belief that with the radiation beam switch off the target chamber was safe from radiation despite the warning signals. Considered in the light of all the circumstances, the court could not say as a matter of law that the warnings were sufficient to constitute unanticipated misuse or contributory negligence.

■ Insufficiency of the evidence is to be sure one of the common law grounds for directing a verdict, granting a judgment n. o. v. or a new trial, but the trial court is justified in pre-empting the jury's verdict only when in his considered judgment it would have no foundation in fact, and the court in the exercise of its judicial discretion would be required to set it aside. See United States v. Hess, 10 Cir., 341 F.2d 444, and cases cited; Auto Transports, Inc. v. Hinman, 10 Cir., 332 F.2d 533. The rule is axiomatic, but its application is always perplexing and necessarily subject to the human equation.

■ It is, of course, the function of the trial court to analyze the evidence and appraise its sufficiency in the first instance. Judge Payne did analyze and appraise the evidence with extreme care, and we should not superimpose our judgment on that of the trial court unless we can say from our objective appraisal of all of the facts and circumstances that his judgment on the adequacy of notice was clearly wrong. When all of the evidence is considered in the light most favorable to appellees, we cannot say that the trial court erroneously submitted it to the jury.

Finally, High Voltage complains of the exclusion of a report of the Atomic Energy Commission made after an investigation to determine inter alia the "cause of and responsibility for the incident". To lay the foundation for admission of the report as a memorandum of an occurrence or event required and made in the regular course of A.E.C. business within the meaning of the Federal Business Records Act (28 U.S.C. § 1732), High Voltage called as a witness the Chairman of the investigating committee who was the Chief of the Quality Assurance, Analyst Section of the A.E.C. area office. He testified that the report was made pursuant to the investigation by a committee (composed of himself and four employees of Sandia) in accordance with the requirements of 0703 of the A.E.C. Manual of Regulations entitled "Notification, Investigation and Reporting of Incidents".

Chapter 0703 provides under the heading of "Policy 022" that "Investigation of incidents shall be initiated by responsible AEC operating officials and shall provide information on the accident necessary to: (a) determine nature and extent (including costs) of the incident; (b) determine the cause of and responsibility for the incident; (c) determine corrective action appropriate to minimize or preclude similar incidents; (d) determine amounts, probability and validity of claims against the Government; (e) assist in the improvement of AEC policies, standards and regulations and of operations thereunder; (f) prepare a written report."

The report gave a detailed account of the accident and experiments conducted by the Committee to determine cause and effect. Under the heading "Probable Cause of Emission" the report stated, "Previously, measurements had shown that with the machine on self-charge and without the beam current or belt charge on, there was a negligible amount of radiation from the Van de Graaff." The appellant relies on this statement to sub-

stantiate his contention that the appellee actually knew the accelerator could emit radiation with the beam switch off.

Under the heading "Conclusion" the report stated in part that "If a radiation detector with either a visible or audible alarm system had been present, neither person should have received an excessive amount of radiation." This is said to go directly to the responsibility of Sandia for the safety of its employees under the Marker case.

Finally, the Committee made a number of specific safety recommendations [4], all of which had to do with safety controls.

 After extended argument on the admissibility of the exhibit, the trial court observed that "If it's a report of what happened, I perhaps should let it come in, but that portion of it which refers to what they should do in the future and makes recommendations about things of that sort seems to me to violate the previous rulings of this court. * * * what may have occurred since the accident [is] not admissible to prove negligence before the accident." Able counsel for the defendant thereupon observed that " * * * I personally agree that a recommendation would not be admissible in evidence in any case." He then indicated his disposition to exclude the concededly inadmissible part of the report, but no attempt was made to segregate the inadmissible and to proffer the admissible. Instead, he offered the entire report as an exhibit and on appeal complains of the refusal of the trial court to admit it. The trial court was never requested to rule on the divisibility of the report and, if divisible, the admissibility of that part which High Voltage contended was relevant and admissible to

prove the critical issue of equal knowledge and adequate notice. It was manifestly incumbent upon High Voltage to separate that part of the report which it contends was relevant and admissible from that which was inadmissible. Failing to do so, the trial court's exclusion of the entire exhbit was proper. See Edward Valves, Inc. v. Cameron Iron Works, Inc., 5 Cir., 286 F.2d 933, 939, citing 1 Wigmore, Evidence, § 17(b) (2), 3rd Ed.

The judgment is affirmed.

---

4. "(1) An automatic fail-safe monitoring system be installed which will have warning lights at the console and both visible and audible alarms in the beam room. (This unit has been installed at this writing).

(2) One person will be delegated absolute authority for the radiation safety in Building 803. In his absence he will delegate an alternate to satisfy this requirement.

(3) This shall include the following:
a. Control over all source material in the area.
b. The operation of the Van de Graaff machine at all times.
c. All personnel will wear film badges at all times while in Building 803.
d. Personnel will not go into the beam room without a monitoring instrument."