431 F.2d 1337
 Anita REYOS et al., Plaintiffs, Appellees and Cross-Appellants,
v.
UNITED STATES of America et al., Defendants, Appellants, and Cross-Appellees.
Anita REYOS et al., Plaintiffs, Appellees and Cross-Appellants,
v.
Fred BURSON et al., Plaintiffs-Appellants.
Anita REYOS et al., Plaintiffs, Appellees and Cross-Appellants,
v.
John B. GALE et al., Defendants-Appellants.
Anita REYOS et al., Plaintiffs, Appellees, and Cross-Appellants,
v.
Verl HASLEM et al., Defendants-Appellants.
Anita REYOS et al., Plaintiffs, Appellees, and Cross-Appellants,
v.
FIRST SECURITY BANK OF UTAH, N.A., a banking corporation of the State of Utah, et al., Defendants-Appellants.
 No. 40-69.
 No. 41-69.
 No. 42-69.
 No. 43-69.
 No. 44-69.
 United States Court of Appeals, Tenth Circuit.
 June 19, 1970.
 Rehearing Denied November 12, 1970.
 
 Edmund B. Clark, Atty., Department of Justice, Washington, D. C. (Shiro Kashiwa, Asst. Atty. Gen., Washington, D. C., William T. Thurman, U. S. Atty., and H. Ralph Klemm, Asst. U. S. Atty., Salt Lake City, Utah, and Roger P. Marquis, Atty., Department of Justice, Washington, D. C., on the brief), for appellant United States of America.
 Richard C. Cahoon, Salt Lake City, Utah (Thomas R. Blonquist, of Burton, Blonquist, Cahoon, Matheson & Shaffer, Salt Lake City, Utah, on the brief), for appellant John B. Gale.
 Hardin A. Whitney, Jr., Salt Lake City, Utah (O. Wood Moyle, III, Salt Lake City, Utah, on the brief), for appellant Verl Haslem.
 Marvin J. Bertoch, Salt Lake City, Utah (Merlin O. Baker, of Ray, Quinney & Nebeker, Salt Lake City, Utah, on the brief), for appellant First Security Bank of Utah, N. A.
 Parker M. Nielson, Salt Lake City, Utah (Adam M. Duncan, Salt Lake City, Utah, on the brief), for appellees Anita Reyos et al.
 Before LEWIS, Chief Judge, SETH, Circuit Judge, and BRATTON, District Judge.
 SETH, Circuit Judge.
 
 
 1
 These suits were commenced by eighty-five individuals with whom the United States originally had full trust relationship as Indians of the Tribe of the Uintah and Ouray Reservation in Utah. Of this group of plaintiffs twelve individuals were selected by the parties as the ones whose cases would be tried first as test cases. These are referred to as the "designated" plaintiffs and are the appellees herein.
 
 
 2
 An Act of Congress directed that the federal trust relationship with the mixed-bloods of the Tribe be terminated, and the tribal property be divided between the mixed-blood and the full-blood groups. This is referred to as "termination." All plaintiffs belonged to the group of some 490 individuals designated by statute as the mixed-bloods of the Tribe.
 
 
 3
 The termination statute (68 Stat. 868, 25 U.S.C. §§ 677-677aa) permitted the mixed-blood group to form associations or corporations to handle some of the property difficult or impossible to distribute to individuals which was allocated to the mixed-blood group, and for matters of general concern to this group. One such corporation so formed was the Ute Distribution Corporation, the stock of which and the stockholders are concerned in these suits.
 
 
 4
 One type of property which the termination statute stated was not to be distributed to individuals was the gas, oil, and mineral interests. Upon division of the tribal property, a portion thereof in undivided interests was allocated to the mixed-blood group. The Ute Distribution Corporation was organized to "handle" this interest of the mixed-bloods jointly with the Tribal Committee which had authority over the full-bloods' share. It was also organized to distribute the group's portion of unliquidated claims against the United States.
 
 
 5
 Ten shares of stock in the UDC were issued to each person in the mixed-blood group, and distributions or dividends were paid to the stockholders from time to time. The defendant bank entered into a contract with this corporation to act as transfer agent and to provide to it some record keeping and related services. In addition, the bank, under the termination statute, was authorized to act as trustee of express trusts for mixed-bloods who, in the opinion of the Secretary of the Interior, needed such help.
 
 
 6
 The individual defendants Gale and Haslem were assistant managers of a facility of the bank located in an area where a number of the mixed-bloods lived, and who dealt directly with some of the plaintiffs in the sale or transfer of their stock.
 
 
 7
 The plaintiffs were stockholders of the UDC who sold shares of their stock to non-Indians. The bank facilities and services were used in connection with these sales or some of them. The causes of action against the bank alleged a breach of the bank's duty arising from the agreement with the UDC and from its participation in the sales of stock. The action against the bank is also based on Regulation 10b-5 of the Securities and Exchange Commission. The causes alleged against the individual defendants Gale and Haslem are based solely on this Regulation.
 
 
 8
 Some time after these suits were filed the complaints were amended to include a cause of action against the United States under the Tort Claims Act. This cause alleged a breach of duty by the Secretary of the Interior and the local officials of the Bureau of Indian Affairs in connection with the transfer of the shares of stock.
 
 
 9
 The trial court, in some one hundred pages of findings and conclusions, found the defendant bank and defendants Gale and Haslem liable for damages to each of the twelve plaintiffs whose cases were selected as test cases for all sales made by them. The United States was found liable only as to some of the plaintiffs. The trial court used the figure of $1500 per share as a value for computing damages.
 
 
 10
 All defendants have appealed from the judgment of the trial court, and the twelve designated plaintiffs, whose cases were tried, have cross-appealed on the ground that the damages were inadequate.
 
 
 11
 
 Liability of the United States Under the Tort Claims Act:
 
 
 
 12
 The position or status of the plaintiffs as related to the provisions and the execution of the termination statute has become one of the fundamental issues on this appeal. The statute, Public Law No. 83-671 (25 U.S.C. §§ 677-677aa), provides solely and expressly for the termination of the federal trust relationship to the mixed-blood members of the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah, and for termination of federal supervision over the trust and restricted property of the mixed-blood members of the Tribe. It directs that there be made a division of the tribal property between the mixed-blood and the full-blood members, and provides the procedure for termination of the mixed-bloods.
 
 
 13
 An examination of the significant portions of the statute is necessary for a proper consideration of the issues. The statute provides for the preparation of membership rolls for each group and the partition and distribution of the tribal assets between the two groups. It also states that upon distribution of the divisible property to the mixed-blood members, federal supervision of such member and his property shall thereby be terminated except as to property not susceptible of practical distribution such as oil, gas, and mineral rights which shall remain subject to the provisions of the Termination Act. Upon termination the mixed-blood individuals shall not be entitled to the services performed by the Government for Indians; that statutes of the United States which affect Indians because of their status shall no longer be applicable to such persons, and that the laws of the several States shall apply to the said members in the same manner as to other citizens within the State. The statute further states that the Secretary shall "* * * protect the rights of members of the tribe who are minors, non compos mentis, or, in the opinion of the Secretary, in the need of assistance in conducting their affairs, by such means as he may deem adequate, * * *." Provision is made for the mixed-blood members of the Tribe to organize for common purposes and adopt a constitution and bylaws. The Act specifically recites that corporations may be formed by the mixed-bloods for grazing of livestock, for the "handling" of water and water rights, and that distribution of property may be made to such corporations.
 
 
 14
 As to gas, oil, and mineral rights in the Ute lands, provision is made that these interests be held in undivided shares by the full-blood members on the one hand, and by the mixed-blood group on the other hand. The Act contemplates that an organization be formed by the mixed-blood group for the purpose of empowering individuals to act as "the authorized representatives of said mixed-blood group in the joint management with the tribe and in the distribution and (sic) [of] unadjudicated claims against the United States, all gas, oil, and mineral rights of every kind. * *" As indicated in the foregoing sentence provision is made in the Act for the joint management of the gas, oil, and other mineral rights by the Tribal Business Committee and the "authorized representatives" of the mixed-blood group. The Act directs that the net proceeds therefrom after deducting the cost chargeable to such management shall be divided between the full-blood and the mixed-blood groups in proportion to their respective numbers on the final membership rolls.
 
 
 15
 The statute directs that at a stated time the Secretary of the Interior issue a proclamation that the federal trust relationship is terminated. This proclamation was so issued on the 26th day of August, 1961, following the distribution of the property to the mixed-blood members excepting the oil, gas, and minerals as contemplated by the statute.
 
 
 16
 The mixed-bloods formed a corporation in 1956, the Ute Distribution Corporation (UDC), and 4900 shares of stock were issued. Each mixed-blood received ten shares. The corporate charter recites that it was formed to "manage jointly with the Tribal Business Committee of the full-blood members of the Ute Indian Tribe" the gas, oil, and mineral rights in common ownership and unliquidated claims against the United States. This was the undistributed property and legal title remained in the United States. The Secretary of the Interior acquiesced in the formation of the corporation, and approved the Articles of Incorporation. The transfer of shares in this corporation by the plaintiff mixed-bloods to non-Indians gave rise to this litigation. The defendant bank became the transfer agent for the transfer of shares of UDC stock. Distributions to UDC shareholders of receipts from mineral leasing were made from time to time.
 
 
 17
 Of particular significance to the issues on this appeal is a provision in the termination statute giving the right to the mixed-blood members to dispose of property they received by distribution. This section states:
 
 
 18
 "Any member of the mixed-blood group may dispose of his interest in the tribal assets prior to termination of Federal supervision, subject to the approval of the Secretary. In the event a member of the mixed-blood group determines to dispose of his interest in any of said real property at any time within ten years from August 27, 1954, he shall first offer it to the members of the tribe, and no sale of any interest, prior to termination of Federal supervision, shall be authorized without such offer to said members of the tribe in such form as may be approved by the Secretary. After termination of Federal supervision the requirement of such offer, in form to be approved by the Secretary, shall be a covenant to run with the land for said ten-year period, and shall be expressly provided in any patent or deed issued prior to the expiration of said period." (25 U.S.C. § 677n).
 
 
 19
 See also the Secretary's Regulations at 25 C.F.R. § 243.8.
 
 
 20
 The essential elements of the quoted section were incorporated in the Articles of Incorporation of the Ute Distribution Corporation to govern the sale of the corporate shares. Thus in the event that a stockholder of the Ute Distribution Corporation desired to sell his stock before August 27, 1964, it was necessary that it first be offered for sale at a stated price to the Tribe or to the members of the Tribe. The procedures and the documents necessary to carry out this provision were arranged for and agreed upon by the local representative of the Bureau of Indian Affairs, by the defendant bank as transfer agent, and by the UDC.
 
 
 21
 Much of the testimony during the trial concerned the execution and delivery of various documents which were required to carry out this requirement of the corporate charter. This provision can best be referred to as a right of refusal in the members of the Tribe or the Tribe. It expired on August 27, 1964.
 
 
 22
 As indicated above, the trial court determined that the United States was liable to the plaintiffs under the Tort Claims Act by reason of a breach of duty in connection with the plaintiffs' sale of their shares of stock in the UDC. This is based on a conclusion that a residual wardship or trust relationship existing between the United States and the plaintiffs survived the statutory termination procedures. The trial court found that the United States had a duty to discourage and to prevent "inconsiderate," "improper," "illegal," and "improvident" sales by the plaintiffs to non-Indians. The court further found that if the United States had prevented irregularities in connection with such sales, "* * * said sales would not have been made, and that the sales of their stock by the designated plaintiffs was the proximate result of the failure of the United States * * * to use reasonable care." The court also determined that the United States had reasonable cause to know that the plaintiffs were being imposed upon and that the other defendants were acting improperly. Thus the court held that the negligence of the United States was the proximate cause of the sale of the stock by the plaintiffs.
 
 
 23
 In its findings and conclusions the trial court does not refer to any particular source of the Government's duty other than the statement that "limited aspects of the federal trust relationship continued until the later date [August 27, 1964] with respect to the restrictions governing the alienation of the stock in the Ute Distribution Corporation," and that under "such continuing duties," it was obligated to discourage and prevent improper and improvident sales. It would thus appear that the court found the limited trust relationship to continue by reason of the right of refusal which was held by the members of the Tribe or the Tribe and applicable to sales of the corporate stock.
 
 
 24
 The plaintiffs in this appeal urge that some continuation of the supervision or wardship giving rise to a duty on the part of the United States resulted from the right of refusal. Plaintiffs refer to the provision as a "restriction on property."
 
 
 25
 We must hold that the trial court was in error in this respect. The provision in the Articles of Incorporation that if the stock was to be sold before August 27, 1964, it should first be offered to "members of the Tribe," constitutes no more than a typical right of refusal in the members of the Tribe or in the Tribe. It was somewhat more difficult to carry out by reason of the fact that notice had to be given to a fairly large number of individuals and provision had to be made to advise the prospective seller that his offer had or had not been accepted by the members of the Tribe. This the Bureau of Indian Affairs undertook to do. It was also necessary if an offer was not accepted, and the prospective seller completed the sale to a stranger, to demonstrate to the Tribe or its members that the sale was in accordance with the offer made to them. This was done by an affidavit executed by the seller stating the sales price received. Other than these complications the provision is a commonplace one.
 
 
 26
 Considerable argument is presented as to whether or not the mixed-bloods were members of the Tribe for the purpose of the right of refusal or whether the right was in the Tribe as such or in the members, but this need not be decided for it is clear that the plaintiffs themselves had no rights under the right of refusal. For a discussion of this point see Ute Indian Tribe of Uintah and Ouray Reservation v. Probst, 428 F.2d 491 (10th Cir.). The shareholder who was here proposing to sell his stock cannot be considered to be within the group in which the right vested. The right was granted clearly to permit the members of the Tribe, the Tribe, or the full-blood members to have the first right to purchase property which was about to be sold to an outsider. This provision was for their benefit in an economic and practical way, and if any purchase was to be made, the members of the Tribe or the Tribe had to do it. The record shows that the Tribe considered purchasing UDC shares when offered, but did not do so nor did any individuals in the Tribe. The right of refusal did not create any "restricted property" in the shares as the term is generally used.
 
 
 27
 The right of refusal thus created no duty on the part of the Government to the then terminated mixed-blood plaintiffs who were seeking to sell their shares of stock. Likewise the procedures and documents devised to carry out the right of refusal and their execution and delivery created no such duty on the part of the United States to the plaintiffs. The statute expressly provides for termination of the Government's relationship with the individual mixed-bloods. The provisions are clear and the termination was accomplished and is final. It is clearly within the power of Congress and no one else to provide for such an end to the relationship between these individuals and the Government. United States v. Waller, 243 U.S. 452, 37 S.Ct. 430, 61 L.Ed. 843; United States v. Nice, 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192; Tiger v. Western Investment Co., 221 U.S. 286, 31 S. Ct. 578, 55 L.Ed. 738. It is not for administrative officials or for the courts to modify this statutory termination by the creation of some status lying between wardship and complete termination.
 
 
 28
 There is not an abundance of authority on the application of termination statutes; however, the court in Crain v. First National Bank of Oregon, 324 F. 2d 532 (9th Cir.), considered the Termination Act relating to the Klamath Tribe. There the court considered determinations made by the Secretary to create express trusts for those "in need of assistance in conducting their affairs," and the effectiveness thereof after termination. The court held that termination was complete except as to the express trusts, and recognized the power of Congress to provide the how, when, and extent of termination. The plaintiffs here urge that the Crain case holds that there continues some trust relationship with all the terminated members. Crain holds that where express trust exists, the individuals under such trust cannot complain that their property is in trust while others may have received theirs outright. We are not concerned in the case before us with the property of individuals under express trusts. See also Menominee Tribe of Indians v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697, and Klamath and Modoc Tribes v. Maison, 338 F.2d 620 (9th Cir.).
 
 
 29
 The trial court was thus in error in concluding that "limited aspects of the federal trust relationship continued," or that any form of wardship continued, and thus that some duty on the part of the Government to the plaintiffs continued after termination in connection with their sales of UDC stock. There being no duty the trial court was in error in awarding damages against the United States under the Tort Claims Act.
 
 
 30
 
 Position of Defendant Bank Under its Contract With The UDC:
 
 
 
 31
 The legal relationships and the business relationships between the plaintiffs and the defendant bank, and with the Ute Distribution Corporation were determined basically and initially by the contract which had been entered into between the bank and the UDC. This agreement was modified somewhat from time to time in practice. The contract was entered into in 1958, but the principal issues with which we are concerned took place in the years 1963, 1964, and 1965.
 
 
 32
 The principal purpose of the contract between the bank and the UDC was to have the bank provide stock transfer services, to do the corporate record keeping, the corporate accounting, and handle distributions or dividends.
 
 
 33
 Of particular consequence in this case was the provision that the bank would act as stock transfer agent for the corporation, and would also assist the corporation in the conduct of its business. The record indicates that it was expected that the bank in the performance of its duties would also accommodate or provide stock transfer services for the individual stockholders of the corporation. This was demonstrated by the fact that the bank was to provide facilities and personnel at Roosevelt, Utah, in an area where many mixed-bloods resided, in order to accommodate transfers of stock. The trial court found that the Roosevelt office of the bank was maintained in part "* * * for the purpose of facilitating and assisting mixed-bloods in the transfer of Ute Distribution Corporation stock. * * *"
 
 
 34
 It is apparent that the transfers of stock of this particular corporation would be somewhat complicated by the existence of the right of refusal in the members of the Tribe, which has been hereinabove described. As indicated, this right of refusal necessitated the creation of forms which would demonstrate that the right of refusal had been complied with in order that the bank could proceed with its customary duties as transfer agent.
 
 
 35
 The contract provided for direct compensation to the bank as transfer agent. It is also apparent from the record that the bank was seeking individual accounts from the tribal members and others. It must be assumed that the parties contemplated the usual notary fees and other ordinary fees incident to the transfers of shares.
 
 
 36
 As a separate matter the bank had also solicited the use of its trust facilities for express trusts to be established by the Secretary for Indians who he felt were not able to handle their property, all as provided in the termination statute. The position of the bank under these express trusts and the statutory provisions for them must be contrasted with the position of the bank in its capacity as transfer agent. The two created separate and distinct functions and duties on the part of the bank.
 
 
 37
 The stock transfer contract contained no provision whereby the bank was to discourage stockholders from selling or transferring their shares; instead the procedure which was established was to facilitate such transfers and located at a place convenient to prospective transferees.
 
 
 38
 As the contract was put into practice, the bank retained the stock certificates of the individuals, and the transfers were handled by stock powers in the usual way. The record shows that the certificates were so retained by the bank in order to prevent their loss by the individual stockholders with the attendant problems to the corporation and the transfer agent in replacing lost certificates. As will be hereinafter mentioned, the stock certificates bore a warning or admonition to the owners to be careful in selling them as they were of undetermined value. Since the stockholders did not have possession of the certificates, they did not have an opportunity to read this warning.
 
 
 39
 Much of the testimony on behalf of the plaintiffs concerned the contents of affidavits which were executed by the plaintiffs in connection with their sale of shares. These affidavits were devised to carry out the right of refusal in that they were to demonstrate that the individual stockholder had in fact sold the shares for the price that he had theretofore offered them to the Tribe or its members by public notice. The affidavit was thus to show that the members of the Tribe did in fact have a real first refusal at the actual selling price. The record shows that in some instances the affidavit may not have accurately described the facts in connection with the sale to the third party. Under the procedure the sale was to be for cash, but the record shows that instead some plaintiffs received automobiles or other tangible property directly or indirectly for their stock instead of cash, or part cash and part tangibles. Bank employees notarized most of these affidavits. The plaintiffs here thus complain that these affidavits which they executed were not accurate, and that the bank and its officials were aware that they were not correct. The record also shows that the Bureau of Indian Affairs office relied upon the recitations in the affidavits when received and issued to the bank a certificate which acknowledged that the right of refusal had been complied with and that the bank could proceed to transfer the shares in the usual way. No shares were transferred by the bank without having first received such a certificate during the period the right of refusal was operative.
 
 
 40
 The trial court expressly concluded that the bank had a duty to discourage the plaintiffs from the sale of their shares of stock of the UDC. This finding or conclusion is not supported by the record as no such duty was created by the practice of the bank and none was provided in the contract. Instead the stock transfer provisions and facilities were provided in order to accomplish and facilitate transfers. The bank was obviously obligated to transfer the shares before August 27, 1964, when requested and when the representative of the Bureau of Indian Affairs indicated that the right of refusal had been honored; and after August 27, 1964, when the stockholder requested that a transfer be made.
 
 
 41
 The bank, shortly after the contract was executed, received a letter from the attorney for the Ute Distribution Corporation asking that it attempt to discourage sales, but no response was made to the letter and no duty or obligation was created thereby. As described above, Congress had directed termination of the Government's relationship with the plaintiffs, and this had been accomplished at the pertinent times. The business inexperience of the plaintiff stockholders does not give rise to any duty on the part of the bank to treat them in any manner different than it would treat any other customer inexperienced in business. The record is clear that the plaintiff's corporation, the UDC, and its officers were active in their attempts to discourage stockholders from transferring their shares and had written letters and held meetings on this subject, all apparently with little success.
 
 
 42
 It would appear that the trial court placed considerable reliance in reaching its conclusion on the asserted inaccuracies in the affidavits executed by the plaintiffs concerning their ultimate sales of the shares. However, the bank or the Government had no duty as to these plaintiffs to see that they executed affidavits that reflected the true transaction. Furthermore the affidavits were executed in connection with the right of refusal in which, as indicated above, the defendants had no interest. It is difficult to see how they can complain of inaccuracies in their own affidavits.
 
 
 43
 The record shows that the bank officials at the Roosevelt office of the defendant bank were active in encouraging a market for the UDC stock among non-Indians. This was probably not contemplated by the UDC-bank relationship. This gave rise to some indirect benefits to the bank by way of increased deposits, but it did not constitute a violation of any duty the bank may have had to the plaintiffs by contract or otherwise.
 
 
 44
 
 Liability Under Regulation 10b-5 of the Securities and Exchange Commission:
 
 
 
 45
 The only cause of action alleged against the individual defendants Gale and Haslem is based upon the violation of Regulation 10b-5 of the Securities and Exchange Commission (17 C.F.R. § 240.10b-5). This regulation was promulgated under the authority of section 10(b) of the 1934 Securities and Exchange Act. This cause of action is also asserted against the defendant bank. Each plaintiff states a separate cause against each of such defendants.
 
 
 46
 The record shows that the defendant Gale purchased for resale for his personal profit ten shares of UDC stock from two of the plaintiffs. The several plaintiffs sold 122 shares of their stock in some thirty-two separate transactions. The trial court found the defendant Gale liable on the sale of all of the 122 shares.
 
 
 47
 As to his individual purchases, the record shows that Gale bought five shares from the plaintiff, Glen V. Reed, on July 8, 1964, for $350 per share. This purchase was made by Gale for Neal H. Phelps and Esther Phelps, or were resold to such persons who paid Gale $530 per share for these shares. Defendant Gale did not advise plaintiff Reed of the resale.
 
 
 48
 Gale also purchased three shares of stock from the plaintiff, Letha H. Wopsock, some time after August 21, 1964, for $350 per share for resale at a higher price which is not disclosed in the record. He also purchased another share from the same person in October 1964 for $400 and an additional share in November 1964 for $350. The disposition by Gale of these two shares is not indicated in the record.
 
 
 49
 The record does not show whether or not the defendant Gale participated for his personal profit or derived a personal profit from the purchase by other persons of shares of stock from the plaintiffs.
 
 
 50
 The participation by the defendant Gale in the sales by other plaintiffs to other persons as shown in the record need not be described in detail. In these transactions a typical participation by the defendant Gale was to act as a notary upon affidavits executed by the purchaser in connection with such a sale which have been hereinabove described or to guarantee the seller's signature on a stock power which was the ultimate basis for the transfer of the shares of stock. As indicated above the trial court found the defendant Gale liable on each of these transactions. However, we hold this to be in error.
 
 
 51
 The "participation" by the defendant Gale in the execution of documents as shown by the record in connection with these sales cannot constitute a breach of duty on his part to any of the plaintiffs. In this connection he did no more than to perform ministerial functions required to carry out the transfer of the shares of stock. In this connection the defendant had no obligation to determine whether the recitations made in the affidavit were correct or not. Furthermore, even if he may have known that the recitations in this affidavit were not entirely correct, the plaintiff executing the particular affidavit was prepared and did assert that the facts were correct, and defendant Gale had no obligation to perform anything but the requested ministerial acts.
 
 
 52
 As to the individual defendant, Verl Haslem, the record indicates a participation in the transactions which is similar to that described above as to the defendant Gale. The trial court also found this defendant liable on each of the thirty-two transactions covering the 122 shares sold by the plaintiffs in this action. The record shows that the defendant Haslem purchased in November 1964 one share of the UDC stock for a third party or for resale for his personal profit from plaintiff Workman for the sum of $350. This was resold by this defendant for an undisclosed price to his brother.
 
 
 53
 This defendant also purchased on August 31, 1964, five shares of stock from plaintiff, Glen V. Reed, for $400 per share and resold the stock apparently on the same day at a price not disclosed in the record.
 
 
 54
 This defendant Haslem "participated" in the other transactions much in the same manner as did the defendant Gale by the execution of affidavits and of signature guarantees and in some instances had nothing whatever to do with the sale. As to these transactions, we find no duty on the part of this defendant to any of the plaintiffs as his acts were purely ministerial in character and were required to accomplish the stock transfers. Likewise his execution of affidavits or guarantees of signature gave rise to no liability to the plaintiffs. Again although the contents of the affidavit may not have been entirely correct, and the defendant may have known of this fact, it did not create any liability to the maker of the incorrect affidavit.
 
 
 55
 The record clearly shows that the defendant bank, the employer of the defendants Gale and Haslem, had knowledge that its employees were purchasing stock for their own account. Further the record shows that in these transactions, the employees used the bank facilities, premises, and personnel. Under these circumstances, these employees as far as the plaintiffs were concerned were apparently acting within their authority. Thus the bank did become liable for any violation of the Regulation 10b-5.
 
 Regulation 10b-5 reads as follows:
 
 56
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
 
 
 57
 "(1) to employ any device, scheme, or artifice to defraud,
 
 
 58
 "(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 
 
 59
 "(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."
 
 
 60
 Neither the regulation nor the Act contains any statement of standards to be applied or elements necessary in actions for civil liability to be brought under the Act, and in fact there is no express provision for such actions.
 
 
 61
 The origin of the rule, its relation to section 17 of the 1933 Act (15 U.S.C. § 77q(a)) and the initial doubt as to whether civil actions were contemplated need not be stated here as these matters are elsewhere fully described. Jensen v. Voyles, 393 F.2d 131 (10th Cir.); Doelle v. Ireco Chemicals, 391 F.2d 6 (10th Cir.); Crist v. United Underwriters, Ltd., 343 F.2d 902 (10th Cir.); Stevens v. Vowell, 343 F.2d 374 (10th Cir.). See, Cohen, Truth in Securities Revisited, 79 Harv.L.Rev. 1340; 3 Loss, Securities Regulation, ¶¶ 1785-86; Fischman v. Raytheon Mfg. Co., 188 F.2d 783 (2d Cir.); Kardon v. National Gypsum Co., 69 F.Supp. 512 (E.D.Pa.); Securities & Exchange Comm'n v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir.) (258 F.Supp. 262); Annot., 37 A.L.R.2d 649; 59 Yale L.J. 1120; 20 Stan.L.Rev. 347; 63 Nw. U.L.Rev. 452; 16 U.C.L.A.L.Rev. 404.
 
 
 62
 As to the elements to be established, the record shows that the individual defendants made a misstatement of a material fact in representing, in those instances wherein they purchased stock for sale at a personal profit, that the prevailing price or market price was the figure at which their own purchase was made. This representation was obviously false in those instances in view of the fact that they resold the shares almost immediately at a higher price. The record shows that the plaintiffs considered these defendants to be familiar with the market for the shares of stock and relied upon them when they desired to sell their shares. The individual defendants, in stating to the plaintiffs in instances where individual purchases were made by the defendants with quick resale at a higher price that the price offered was "all that they could give" or "was all that it was worth" or similar statements, made a misrepresentation as to the prevailing price. The defendant Haslem testified with reference to his purchase from plaintiff Workman, "I contacted a number of people telling them that if they were interested in selling, I was interested in offering the highest price." The bank and the individual defendant employees had developed a market at the Roosevelt Agency of the bank for UDC stock, received inquiries from time to time for stock, and had customers of the bank who were prepared to make purchases from time to time. The defendant bank and the individual defendants were thus entirely familiar with the prevailing market for the shares at all material times.
 
 
 63
 The record shows in some instances that purchases for resale were made, but the resale price is not disclosed in the record. If in these instances there was a resale at a higher price, there was demonstrated thereby a misrepresentation to the plaintiff concerned as to the prevailing market price. This was a material fact. List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.).
 
 
 64
 In Stevens v. Vowell, 343 F.2d 374 (10th Cir.), we considered a private action under Regulation 10b-5. The trial court had made findings that critical facts had been concealed from the plaintiff investor and misrepresentations were made to him. The court also specifically found that the plaintiff had there relied upon all the representations made to him by the defendants. These findings were supported by the record. There was no issue on appeal as to reliance, and little as to the fact of misrepresentations. We there stated that it was not necessary to prove common law fraud, but necessary to prove "one of the prohibited actions." This referred to one of the (a), (b) or (c) subsections of the rule. In the cited case the (b) subsection was relied upon and with the reliance established the case was proven. The opinion does not hold that reliance is not required, as the plaintiff urges. It is a basic element of a cause of this nature, and was there shown.
 
 
 65
 In the case before us the facts of misrepresentation have been shown as to several of the transactions. The record, however, does not contain any evidence relating to reliance by the plaintiffs on the representations of the defendants Gale and Haslem. This is a necessary element of the cause alleged. List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.), considers, defines, and requires both materiality of the representations and reliance. See also, 16 U.C.L.A.L. Rev. 404; 63 Nw.U.L.Rev. 434. The plaintiffs allege that certain acts and statements of the defendants were directed to them or were the proximate cause of their damages. Thus the causal connection must be established — that in fact the loss resulted from defendants' acts — a simple and fundamental proposition in such actions for private damages. The plaintiffs' argument refers to several cases where the proceedings were brought by the SEC for enforcement. The matter of reliance was not there considered, but these are from an entirely different position.
 
 
 66
 The record does not support the trial court's finding of a conspiracy, plan, or scheme to violate any duties owed to the plaintiffs by any of the defendants. The trial court was in error in so finding.
 
 
 67
 The record shows sufficient evidence of the use of the mails or instrumentalities of commerce by the individual defendants in their violation of Regulation 10b-5 as described above. The testimony as to the use of checks, even on the defendant bank, together with the correspondence with prospective buyers is sufficient. The defendant Haslem purchased in what are referred to as "face to face" transactions with a plaintiff and the certificate was delivered. However, again a check or checks were used and the trial court's finding is supported on this issue although the facts are not well developed.
 
 
 68
 The pretrial order is not entirely clear as to the inclusion of transactions taking place after August 27, 1964. However, we must agree with the trial court that these properly became trial issues.
 
 
 69
 The measure of damages has been referred to above briefly. We hold that the trial court was in error in using the value of $1500 per share in the computation of damages as the evidence does not support such a figure. Also the evidence does not support the finding that the market price was depressed by the defendants. As to the cross-appeals, the evidence as to greater values was entirely speculative, as the trial court concluded.
 
 
 70
 The measure of damages for breaches of duty under Regulation 10b-5 is the profit made by the defendant on resale of stock purchased from the plaintiffs. If no resale was made or if the resale was not at arm's length, then the measure is the prevailing market price at the time of the purchase from the plaintiffs.
 
 
 71
 Reversed and remanded for further proceedings in accordance with this opinion.