**John T. ALLEN, Jr., et al., Plaintiffs-Appellants,**

v.

**H. K. PORTER CO., Inc., Defendant-Appellee.**

**No. 71–1110.**

United States Court of Appeals, Tenth Circuit.

Dec. 20, 1971.

---

Thomas C. Seawell, Denver, Colo. (Bruce Ducker, Denver, Colo., with him on the brief), for plaintiffs-appellants.

Donald C. McKinlay, Denver, Colo. (Richard G. Wohlgenant and Brian D. Fitzgerald, Denver, Colo., with him on the brief), for defendant-appellee.

Before PICKETT, HILL and BARRETT, Circuit Judges.

PICKETT, Circuit Judge.

This action was brought by Boettcher and Company,[1] some of its partners and customers. They seek damages from appellee H. K. Porter Company, Inc. for an alleged violation of Rule 10b–5 promulgated under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). The essence of the complaint is that the Porter Company, in soliciting the purchase of subordinated debentures issued by Pacific Asbestos Company, a Nevada corporation, made material misrepresentations and nondisclosures in connection with the offer to purchase. At the conclusion of all the evidence the trial court directed a verdict in favor of the Porter Company.

The material facts are not in dispute. Pacific Asbestos Company came into existence in 1959 for the purpose of engaging in mining, milling and marketing of asbestos fiber in the State of California. Its financing included the issuance of first mortgage bonds and Series "A" and "B" debentures. Boettcher became interested in Pacific in 1961 and was a principal participant in the original underwriting of Pacific securities, including the debentures which are involved in this case. From the beginning of its operations Pacific experienced financial difficulties and in 1963 the debentures were in default. Sometime thereafter the bonds also defaulted in interest payments. No interest was paid on any of these securities after default. The financial setbacks were attributed to problems in the mining and milling of the asbestos ore and lack of capital. Various unsuccessful attempts were made to rehabilitate Pacific and its future appeared to be hopeless. Its mortgage creditors were threatening to foreclose and the

---

1. Boettcher and Company is a Denver based security brokerage firm.

"operations were about to grind to a halt." Boettcher and its clients knew that it would take a substantial amount of money to revive the company. With Boettcher attempting to maintain a market, the price of the debentures declined to less than $10.00 per hundred in 1968.

Late in 1968, the Porter Company became interested and purchased the secured debt of Pacific, together with the mortgages and 76% of the company's common stock. At the time of these purchases Porter estimated that it would require $1,250,000.00 to rebuild the needed mill facilities and provide adequate working capital for a successful operation.

After a study of various methods to relieve Pacific of its debts, including foreclosure and bankruptcy proceedings, Porter determined that it would attempt to acquire the unsecured indebtedness of Pacific and that it would offer to the holders of the outstanding debentures $18.00 per hundred on the "A" debentures, and $20.00 on the "B" debentures. A written offer to purchase was prepared and circulated on January 3, 1969. The offer stated that it had acquired the secured indebtedness of Pacific, together with 76% of the common stock for approximately 57.8 cents on the dollar. The offer then stated:

> In order to avoid delay and litigation in a foreclosure proceeding, H. K. Porter Company, Inc. is hereby making an offer to all of the subordinated debenture holders of Pacific Asbestos Corporation, Series B senior subordinated debentures and Series A subordinated debentures. The price H. K. Porter Company, Inc. offers is 20% of unpaid principal for the Series B senior subordinated debentures, or $200 for each $1,000.00 of unpaid principal, and 18% of unpaid principal for the Series A junior subordinated debentures or $10.80 for each $60.00 of unpaid principal.

The offer was conditioned upon the acceptance of 90% of the debentures prior to January 31, 1969. It also reserved the right to accept a lesser amount. The offer made no reference to the amount of capital that Porter intended to inject into Pacific to revitalize that company.

The representations and nondisclosures which appellants contend induced them to accept the offer to purchase and which they now contend violated Rule 10b–5 are (a) that Porter's threat of foreclosure on the senior secured indebtedness was an affirmative misrepresentation of Porter's intentions, and (b) that Porter's silence concerning the injection of new capital into Pacific constituted the omission of material facts. Specifically it is argued that Porter misrepresented that it intended to foreclose the mortgages securing the bonded indebtedness which would render appellants' debentures worthless when in fact it had no intention of foreclosing under any circumstances, and that Porter's failure to disclose that it intended to supply Pacific with sufficient capital to improve its mine and mill facilities was an omission of a material fact within the meaning of Rule 10b–5.[2]

This court has often said that a directed verdict is justified only when the evidence and proof is "all one way or so overwhelmingly preponderant in favor

---

2. Rule 10b–5, 17 C.F.R. § 240.10b–5, reads as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

of the movant as to permit no other rational conclusion." Kiner v. Northcutt, 424 F.2d 222, 223 (10th Cir. 1970), quoting Fischer Construction Co. v. Fireman's Fund Insurance Co., 420 F.2d 271, 275 (10th Cir. 1969); Western Casualty & Surety Company v. Grice, 422 F.2d 921 (10th Cir. 1970); C. H. Codding & Sons v. Armour and Company, 404 F.2d 1 (10th Cir. 1968). In High Voltage Engineering Corporation v. Pierce, 359 F.2d 33, 38 (10th Cir. 1966), Judge Murrah stated that in such cases it was the function of the trial judge to analyze and appraise the sufficiency of the evidence and "we should not superimpose our judgment on that of the trial court unless we can say from our objective appraisal of all of the facts and circumstances that his judgment . . . was clearly wrong."

We have also recognized that neither the Rule nor the Securities Exchange Act sets forth the elements necessary to establish civil liability under Rule 10b–5. Reyos v. United States, 431 F.2d 1337, 1347 (10th Cir. 1970). Nor has this court attempted to specify what forms of deception are prohibited; rather we have held that *"all* fraudulent schemes *in connection* with the purchase and sale of securities are prohibited." Richardson v. MacArthur, 451 F.2d 35 (10th Cir. 1971). Furthermore, "[i]t is not necessary to allege or prove common law fraud to make out a case under the statute and rule." Mitchell v. Texas Gulf Sulphur Company, 446 F.2d 90, 97 (10th Cir. 1971), citing Stevens v. Vowell, 343 F.2d 374, 379 (10th Cir. 1965). It is agreed that the basis for liability in this instance rests on the misstatement or nondisclosure of a material fact knowingly misstated or omitted upon which a person relies in selling or buying a security which causes damage. Mitchell v. Texas Gulf Sulphur Company, *supra;* Reyos v. United States, *supra* at 1347, 1348; List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir. 1965), cert. denied sub nom., List v. Lerner Stores, 382 U. S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); Trussell v. United Underwriters, Ltd., 228 F.Supp. 757 (D.Colo.1964).

Reliance upon the reference to foreclosure in the offer to purchase and the failure of Porter to advise the prospective sellers of the money necessary to be put into the company to get it on its feet as grounds of fraud, is, to say the least, very tenuous. All of the debenture holders knew of Pacific's financial problems, that their securities were subordinated to those secured by a first mortgage. They knew of Porter's right to foreclose and that a foreclosure would wipe them out. Boettcher had for years continuously kept them informed as to the condition of the company and the necessity for new capital. Porter's offer was twice the amount for which the securities could have been sold on the market. Boettcher strongly advised the acceptance of the offer as the debenture owners were in an unfavorable position without a foreclosure.

The argument that Porter never intended to foreclose is not sustained by the record, which discloses that foreclosure was never ruled out. The Chairman of Porter's Board of Directors testified at the trial that foreclosure was a possibility even at that time and the record does not substantiate the claim that Porter intended or was bound to put $1,250,000.00 into the company to get it on its feet.

There were no definite plans to rehabilitate Pacific prior to May, 1969. The need for injection of cash into Pacific was well known to the security holders, as they had known for a number of years that a large amount of new capital was necessary for the purchase of machinery and for working capital before this debt-ridden and insolvent company could make any progress. The chief traders and the managing partner of Boettcher, who were familiar with Pacific throughout the years, recommended that the offer be accepted and believed that it was more prudent to sell rather than risk the uncertainty of foreclosure or the possibility of becoming minority security holders.

We find nothing in the record which even borders on a device, scheme or artifice to defraud which caused the debenture holders to sell their holdings for a price "substantially below their true value." The evidence is uncontradicted that they received at least twice the actual market value.

In a nutshell, the situation was that Porter desired to keep the Pacific Corporation intact and avoid foreclosure of its mortgage or some form of bankruptcy proceedings. It made a bona fide offer to purchase the outstanding debentures. Boettcher and other knowledgeable persons recommended acceptance, and the debenture owners followed this recommendation.

In light of all the circumstances of this case, there were no untrue statements or a failure to disclose any material fact in the offer to purchase. We agree with the statement of the trial court that there was "no semblance whatever of a lawsuit."

Affirmed.