# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 11, 2006       Decided January 19, 2007

No. 06-5092

ORANNA BUMGARNER FELTER, ET AL.,
APPELLANTS

v.

DIRK KEMPTHORNE, SECRETARY OF THE INTERIOR, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 02cv02156)

*Dennis G. Chappabitty* argued the cause and filed the briefs
for appellants.

*John E. Arbab*, Attorney, U.S. Department of Justice,
argued the cause for appellees. With him on the brief was *David
C. Shilton*, Attorney.

Before: TATEL and KAVANAUGH, *Circuit Judges*, and
WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: In 2002, appellants, former members

of the Ute Indian Tribe and their descendants, filed a multi-count complaint alleging that in the 1950s and 1960s the federal government improperly terminated their status as federally recognized Indians and, in the process of partitioning tribal assets prior to termination, breached its fiduciary duty to them. The district court dismissed the complaint, finding that plaintiffs' claims were barred by the six-year statute of limitations for non-tort actions against the United States. Although we agree with the district court's reasoning, we nonetheless remand the case for consideration of whether plaintiffs' claims have been saved by recently enacted legislation providing that the statute of limitations "shall not commence to run" on Indian claims of trust fund mismanagement until the United States has provided an accounting.

## I.

Because the district court dismissed plaintiffs' claims under Federal Rule of Civil Procedure 12(b), "we assume that the facts alleged in plaintiffs' complaint are true." *Wagener v. SBC Pension Benefit Plan—Non Bargained Program*, 407 F.3d 395, 397 (D.C. Cir. 2005) (regarding motion to dismiss for failure to state a claim); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (regarding motion to dismiss for lack of subject matter jurisdiction). Viewed through this lens, the complaint relates the following:

In 1861, President Abraham Lincoln declared the Uinta Valley in Eastern Utah to be an Indian reservation, later named the Uinta and Ouray Reservation. Several years later, the Uinta Band, the aboriginal occupants of substantial portions of present-day Utah, including the Uinta Valley, was forcibly relocated to the reservation. Then, in 1881, the United States government removed the White River Band of Utes, who had

historically resided in western Colorado, to the same reservation. Around the turn of the century, the government allotted portions of the reservation to the Uncompaghre Band, who had also historically resided in western Colorado. Recognizing the "exclusive property" interest of the Uinta Band to the Uinta and Ouray Reservation, the federal government provided compensation to the Uinta Band for the portions of their reservation given to the White River and Uncompaghre Bands. Am. Compl. ¶ 31.

In 1937, the "Ute Indian Tribe," repeatedly referred to in the complaint as "a modern fiction," was created pursuant to the Indian Reorganization Act, 25 U.S.C. § 461 *et seq*. *See* Am. Compl. ¶ 33. This new "tribe" consisted of the three bands—Uinta, White River, and Uncompaghre—now living on the Uinta and Ouray Reservation. Under a newly adopted tribal constitution, a "Tribal Business Committee" acted as the governing body of the tribe, with each band having equal representation on the Committee. *Id.* ¶¶ 34-36. Despite the consolidation of the bands, each band retained all property rights held prior to the formation of the Ute Indian Tribe. Moreover, the Tribal Business Committee was authorized to take action regarding a band's preexisting property only with that band's consent.

In 1950, the Confederated Bands of Colorado Utes, of whom the Uncompaghre and White River Bands—but not the Uinta Band—were members, obtained a thirty-two million dollar Indian Claims Commission judgment against the United States for the seizure of their western Colorado lands. The Ute Indian Tribe then adopted the "Share and Share Alike" agreement, under which the Uinta Band, in exchange for a share of the judgment, would agree to relinquish its separate claim against the United States for compensation for seized land. As characterized by Congress in an act related to payment of the

judgment, the Share and Share Alike agreement also stated that "land within the Uintah and Ouray Reservation and income issuing therefrom . . . shall become the tribal property of all the Indians of the Ute Indian Tribe . . . without regard to band derivation." 25 U.S.C. § 672. According to the complaint, however, the Bureau of Indian Affairs knew that the Share and Share Alike agreement was invalid because the members of the Uinta Band had never approved it.

Next, the complaint alleges that in 1954 defendants "coerced, threatened, fooled and otherwise forced" the three bands to seek "termination" of their status as federally recognized Indians in order to secure the dispersal of the thirty-two million dollar judgment. Am. Compl. ¶ 43. A federal policy implemented during the 1950s and early 1960s, "termination" sought to assimilate Indians by ending their special relationship with the United States, discontinuing federal programs for "terminated" Indians, and subjecting them to state law and taxation. *See* H.R. Con. Res. 108, 83rd Cong. (1953) (declaring termination policy); *see also* Charles F. Wilkinson & Eric R. Biggs, *The Evolution of the Termination Policy*, 5 AM. INDIAN L. REV. 139, 151-54 (1977) (decribing common elements in termination plans). In 1970, however, President Nixon called on Congress to "renounce" and "repudiate" termination, referring to this chapter of federal Indian policy as "morally and legally unacceptable." *See* MESSAGE FROM THE PRESIDENT OF THE UNITED STATES TRANSMITTING RECOMMENDATIONS FOR INDIAN POLICY, H.R. DOC. NO. 91-363, at 3 (1970).

In March 1954, under pressure from the Department of the Interior, the Ute Indian Tribe voted to "terminate" from the tribe what it referred to as its "mixed-blood" members, and to divide the assets of the tribe between the "mixed-blood" and "full-blood" Utes. Am. Compl. ¶¶ 46-47. As later defined by statute,

"full-blood" Utes are "member[s] of the tribe who possess[] one-half degree of Ute Indian blood and a total of Indian blood in excess of one-half." 25 U.S.C. § 677a(b). "Mixed-blood" Utes—members of the tribe who do not meet these criteria, *id.* § 677a(c)—were predominantly members of the Uinta Band. The complaint alleges that the tribe's vote suffered from significant procedural irregularities, including that it was never ratified by the Uinta Band.

Nonetheless, in response to the tribe's vote, Congress passed the Ute Partition and Termination Act (UPA), 25 U.S.C. § 677 *et seq.*, which provided for the "partition and distribution of the assets of the Ute Indian Tribe . . . between the mixed-blood and full-blood members thereof; [and] for the termination of Federal supervision over the trust, and restricted property, of the mixed-blood members of said tribe . . . ." *Id.* § 677. The UPA directed the tribe "to prepare and submit to the Secretary a proposed roll of the full-blood members of the tribe, and a proposed roll of the mixed-blood members . . . . [but i]f the tribe fails to submit such proposed rolls within the time specified in this [Act], the Secretary shall prepare such proposed rolls for the tribe." *Id.*. § 677g. Final rolls published on April 5, 1956, identified 490 members of the Ute Indian Tribe as "mixed-bloods." *See Mixed-Blood Members and Full-Blood Members of Ute Indian Tribe of Uintah and Ouray Reservation, Utah*, 21 Fed. Reg. 2208 (Apr. 5, 1956). After publication of these rolls, the statute required the Tribal Business Committee, on behalf of the "full-blood" Utes, and an "authorized representative[]" of the "mixed-blood" members to divide "the assets of the tribe that are then susceptible to equitable and practicable distribution." 25 U.S.C. § 677i. Upon completion of the partition process, the statute instructs the Secretary to "immediately transfer to [each "mixed-blood" Ute] unrestricted control of all other property held in trust for such mixed-blood member by the United States," and terminate "Federal

supervision of such member and his property." *Id.* § 677*o*. On August 24, 1961, the Secretary published a notice terminating the 490 "mixed-blood" Utes' status as federally recognized Indians. *See Termination of Federal Supervision over the Affairs of the Individual Mixed-Blood Members*, 26 Fed. Reg. 8042 (Aug. 26, 1961).

Appellants Oranna Bumgarner Felter and her fellow plaintiffs are either among the 490 members whose status as federally recognized Indians was terminated in 1961 or are descended from those individuals. In a complaint initially filed on November 4, 2002, and later amended, Felter alleges that the Interior Department improperly implemented the UPA, and thereby unlawfully deprived her of her status as a federally recognized Indian, her land rights, and her share of the thirty-two million dollar judgment. Claiming that the U.S. government never properly terminated its trust relationship with her, Felter asserts that "defendants were *and are* obligated to safeguard the trust status of the lands and Indian rights and status of the individual 'mixed-blood' members [of the] Uinta Band." Am. Compl. ¶ 103 (emphasis added). Thus, Felter alleges that Interior breached its fiduciary duty during the partition process, as well as that its failure to rectify that violation constitutes a continuing breach of its fiduciary duty. In the complaint's eighth count, Felter further alleges that Interior "failed to account for" and "grossly mismanaged" her share of the thirty-two million dollar judgment. *Id.* ¶ 110.

The district court granted the government's motion to dismiss the complaint on the ground that Felter's claims are time-barred under 28 U.S.C. § 2401(a), which states that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." Felter appeals. We review the district court's order granting the motion to dismiss de novo. *See, e.g.*,

*Rochon v. Gonzales*, 438 F.3d 1211, 1216 (D.C. Cir. 2006).

## II.

Section 2401(a) generally "applies to all civil actions whether legal, equitable, or mixed." *Kendall v. Army Bd. for Corr. of Military Records*, 996 F.2d 362, 365 (D.C. Cir. 1993). *But see Wilderness Soc'y v. Norton*, 434 F.3d 584, 588 (D.C. Cir. 2006) ("This court has repeatedly refused to hold that actions seeking relief under 5 U.S.C. § 706(1) to 'compel agency action unlawfully withheld or unreasonably delayed' are time-barred if initiated more than six years after an agency fails to meet a statutory deadline."). Actions usually accrue "when [they] come[] into existence." *United States v. Lindsay*, 346 U.S. 568, 569 (1954). In this case, as the district court found, none of the acts underlying any of Felter's claims occurred within the six years prior to the filing of the complaint in 2002. *See Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1578-79 (Fed. Cir. 1988) (holding terminated Indians' claims accrued during termination and partition process under an analogous statute of limitations). In particular, the alleged misapplication of the UPA and the resulting termination of trust status and asset distribution occurred in the 1950s and 1960s. Felter's effort to recharacterize her claim by asserting that Interior's failure to rectify its past illegal termination constitutes a current breach of trust cannot save her case. Any such claim accrued in 1961 when Interior repudiated its trust relationship with Felter and the other "mixed-blood" Utes, regardless of whether that repudiation conformed to Interior's statutory and fiduciary obligations. *See Hopland Band*, 855 F.2d at 1578-79 (holding statute of limitations on breach of trust claims accrued at the latest when federal government terminated federal trust relationship over the band).

The district court also correctly held that neither the

continuing violation nor the equitable tolling doctrines provides a safe harbor for Felter's claims. In reaching this conclusion, the district court engaged in an extensive and interesting analysis of whether the Supreme Court's decision in *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1990), undermined this court's precedent holding section 2401(a) to be jurisdictional, and thus not susceptible to such judicial exceptions. *See Felter v. Norton*, 412 F. Supp. 2d 118, 122-24 (D.D.C. 2006); *see also Harris v. FAA*, 353 F.3d 1006, 1013 n.7 (D.C. Cir. 2004) (noting tension between *Irwin*'s holding that the "same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States," 498 U.S. at 95-96, and this court's precedent that "[u]nlike an ordinary statute of limitations, § 2401(a) is a jurisdictional condition attached to the government's waiver of sovereign immunity," *Spannaus v. DOJ*, 824 F.2d 52, 55 (D.C. Cir. 1987)). We need not resolve this issue, for Felter's claims fail even if these doctrines apply to section 2401(a).

We begin with the continuing violation argument. Even assuming that doctrine, which typically pertains to employment discrimination claims, applies to this case, Felter's complaint alleges no acts committed by the defendants within the statute of limitations that could constitute a continuing violation. Although Felter and her co-plaintiffs do assert that their termination and the loss of their lands and other trust assets, all of which happened in the 1950s and 1960s, continues to have lasting *effects* on the lives of all "mixed-blood" Utes, she asserts no new *acts* committed by Interior since that time. As we have held, "[a] lingering effect of an unlawful act is not itself an unlawful act." *Guerra v. Cuomo*, 176 F.3d 547, 551 (D.C. Cir. 1999) (quoting *Dasgupta v. Univ. of Wis. Bd. of Regents*, 121 F.3d 1138, 1140 (7th Cir. 1997)).

Felter also fails to allege sufficient facts to support equitable

tolling. To benefit from such tolling, she must demonstrate "(1) that [she] has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). Although Felter argues that the "extraordinary circumstance" element has been met by Interior's alleged "fail[ure] or refus[al] to give the Uinta Band mixed-bloods accurate and adequate information," Appellants' Br. at 19, she asserted neither in her brief nor at oral argument that she diligently pursued her claim over the last forty-plus years.

## III.

Although at this point we would normally affirm the district court's section 2401(a) dismissal of the complaint, Felter argues that a recently-enacted statute preserves her claims. Specifically, approximately one month after Felter filed her response to the government's motion to dismiss, Congress enacted the Department of the Interior and Related Agencies Appropriations Act, 2004, Pub. L. No. 108-108, 117 Stat. 1241 (2003) (hereinafter P.L. 108-108), which in relevant part declares:

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

117 Stat. at 1263.

The government argues that P.L. 108-108 does not apply to this case because it covers only claims "concerning the losses to or mismanagement of trust funds," whereas "the gravamen of Felter's suit" instead concerns "improper termination of federally recognized Indian status." Appellees' Br. at 15. Felter, however, responds that her complaint includes allegations that *prior to termination* Interior breached its fiduciary duty by conspiring with the "full-blood" Utes and non-Indians to transfer to these individuals land and other property that the United States held in trust for plaintiffs as members of the Uinta Band. *See, e.g.*, Am. Compl. ¶ 64. In the same vein, Felter notes that the complaint alleges that Interior "grossly mismanaged" assets held in trust prior to termination. *See, e.g.*, Am. Compl. ¶¶ 110-11.

The government also argues that Felter has waived her P.L. 108-108 argument by failing to present it to the district court. But Felter did argue in the district court that section 2401(a) does not bar her claim, and she now contends that P.L. 108-108 supports that argument. Although we generally decline to consider arguments not raised in the district court, *see District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984), we have been careful to distinguish between failure to make an argument and failure to cite relevant legal authority, particularly where, as here, the interpretation of a statute is at issue. As the Supreme Court has explained, courts have an "independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). As a result, in *United States v. Rapone*, 131 F.3d 188, 196-97 (D.C. Cir. 1997), we held that a defendant who had repeatedly demanded a jury trial but failed to cite the relevant statute granting him this right may raise the overlooked legal authority on appeal. "Ignoring relevant precedents discovered on appeal," we explained, "could 'occasion appellate affirmation of incorrect legal results.'" *Id.* at

197 (quoting *Elder v. Holloway*, 510 U.S. 510, 515 n.3 (1994)). Likewise, in *Martini v. Fed. Nat'l Mortgage Ass'n*, 178 F.3d 1336 (D.C. Cir. 1999), we relied on a provision of a statute that the parties had failed to cite, explaining that "we have a duty to conduct an 'independent examination' of the statute in question." *Id.* at 1345-46; *see also New York v. EPA*, 431 F.3d 801, 802 (D.C. Cir. 2005) (Williams, J., concurring) (addressing similar issue with regard to applicable regulation parties failed to raise). Here, the government seeks dismissal of Felter's action under 28 U.S.C. § 2401(a), but in order to interpret that statute correctly, it must be determined whether it has been modified by P.L. 108-108. Because the district court had no opportunity to consider that question, and because the parties have not fully briefed the issue here, we remand to the district court to determine whether P.L. 108-108 applies to any of Felter's claims.

*So ordered.*