Oranna Bumgarner FELTER,
et al., Plaintiffs,

v.

Ken SALAZAR, et al., Defendants.

Civil Action No. 02–2156 (RWR).

United States District Court,
District of Columbia.

Jan. 15, 2010.

Dennis G. Chappabitty, Sacramento, CA, for Plaintiffs.

Sara E. Costello, U.S. Department of Justice, Washington, D.C., for Defendants.

### MEMORANDUM OPINION

RICHARD W. ROBERTS, District Judge.

Asserting that they are "mixed-blood" members of the Ute Band of Indians, the plaintiffs filed this action in 2002 against the Secretary[1] of the Department of the Interior ("DOI"), the Assistant Secretary for Indian Affairs of the DOI, the United States of America, and two employees of the Bureau of Indian Affairs for injuries suffered as a result of the defendants' alleged wrongful termination under the Ute Partition and Termination Act ("UPA"), 25 U.S.C. §§ 677 et seq., of plaintiffs' status as federally recognized Indians. Defendants move to dismiss plaintiffs' claims for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted, arguing that the Department of the Interior and Related Agencies Appropriations Act, 2004, Pub.L. No. 108–108, 117 Stat. 1241 (2003) ("P.L.108–108"), did not revive plaintiffs' claims for which the limitations period had expired, and that prior judgments preclude the plaintiffs' claim for an accounting. Although P.L. 108–108 does apply retroactively to claims of trust mismanagement in litigation pending at the time of its enactment, the plaintiffs are collaterally estopped from arguing that they are entitled to an accounting due to the defendants' mismanagement of trust assets because prior litigation to which the plaintiffs are bound resolved that the UPA terminated the government's trust obligations. Thus, the defendants' motion to dismiss will be granted.

### BACKGROUND

The background of this case is fully discussed in *Felter v. Norton*, 412 F.Supp.2d 118 (D.D.C.2006) and *Felter v. Kempthorne*, 473 F.3d 1255, 1257–59 (D.C.Cir.2007). Briefly, the plaintiffs allege that their federal status as recognized Ute Indians was unlawfully terminated by the UPA. In 1954, the Ute Tribe's General Council voted to categorize members of the tribe as either "full-bloods" or "mixed-bloods" and to separate the assets of the two groups. In response to the vote, Congress passed the UPA, under which full-bloods were defined as Ute members whose ancestry was at least one-half Ute

---

1. Ken Salazar is substituted for Gale Norton under Fed.R.Civ.P. 25(d).

Indian and over one-half Indian. 25 U.S.C. § 677a(b). Mixed-bloods were defined as Ute members who did not have sufficient Ute or Indian ancestry to qualify as full-bloods. 25 U.S.C. § 677a(c). The UPA formally distributed the reservation's assets between the mixed-bloods and the full-bloods, terminated the mixed-bloods' rights to a $32,000,000 Indian Claims Commission ("ICC") judgment because the mixed-bloods were no longer considered members of the Ute Tribe after the UPA, and terminated the mixed-bloods' status as federally recognized Indians. As required by the UPA, the Secretary of the Interior then published in the Federal Register the list of the 490 mixed-bloods, 21 Fed. Reg. 2208–04, and the corresponding federal policy of terminating supervision over the affairs of the mixed-bloods and their status as federally recognized Indians, effective as of August 27, 1961. 26 Fed. Reg. 8042–03.

Plaintiffs' complaint seeks a judgment declaring that the 1961 list of the 490 mixed-bloods unlawfully terminated their status as recognized Ute Indians and is void; restoring their rights retroactively to their reservation assets wrongfully distributed under the UPA; restoring to their status as Uinta Indians the Uinta who were minors in 1961 and not listed among the 490; awarding the 490 damages for their loss of status as Indians under the UPA, for breach of trust and for the violation of the due process clause of·the Fifth Amendment; and ordering an accounting of the $32,000,000 ICC judgment allocated to the Colorado bands of Ute Indians. (Am. Compl. 61–64.) Earlier, the defendants' motion to dismiss all claims was granted because the plaintiffs did not allege any acts that the defendants committed within the six-year statute of limitations period under 28 U.S.C. § 2401(a), and failed to justify the application of any exception to allow them to file this action outside the limitations period. *Felter*, 412 F.Supp.2d at 125–27.

On appeal, the plaintiffs raised a new issue, arguing that P.L. 108–108 "preserve[d] [their] claims." *Felter*, 473 F.3d at 1260. The D.C. Circuit agreed that the plaintiffs' claims had accrued in the 1950s and 1960s, that there were no continuous violations that made the complaint timely filed, and that equitable tolling of the statute of limitations did not apply. However, the court remanded the case "to determine whether [P.L.] 108–108 applies to any of Felter's claims." *Id.* at 1259–61.

On remand, the defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and (6), arguing that P.L. 108–108 does not apply to Count 8,[2] a claim for an accounting, because the plaintiffs' expired claim was not revived. (Defs.' Mem. of P. & A. in Supp. of Defs.' Renewed Mot. to Dis. ("Defs.' Renewed Mem.") at 5, 8, 10.) The defendants also argue that even if P.L. 108–108 revived the plaintiffs' claim, it would still be barred by collateral estoppel because *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), resolved that the UPA terminated the Secretary of the Interior's responsibility over divisible tribal assets, including the mixed-blood's share of the ICC judgment. (Defs.' Renewed Mem. at 12 n.8; Defs.' Mem. of P. & A. in Supp. of Defs.' Mot. to Dis. at 14.) The plaintiffs oppose the defendants' renewed motion to dismiss, arguing that P.L. 108–108 revives

---

**2.** The defendants move to dismiss all of the plaintiffs' claims, not just Count 8. However, the plaintiffs' opposition did not address the defendants' motion to dismiss as to Counts 1 through 7. Therefore, the defendants' motion is deemed conceded as to Counts 1 through 7. *See Peter B. v. CIA*, 620 F.Supp.2d 58, 70 (D.D.C.2009).

their accounting claim and that they are not collaterally estopped from bringing the claim. (Pls.' Opp'n to Defs.' Renewed Mot. to Dis. at 20; Pls.' Suppl. Mem. in Opp'n to Defs.' Mot. to Dis. at 9–15.)

## DISCUSSION

Whether the statute of limitations expired for the plaintiffs' claim for an accounting should be analyzed under Rule 12(b)(6) for failure to state a claim. *See Felter*, 412 F.Supp.2d at 124. The affirmative defense of collateral estoppel may also be raised in a Rule 12(b)(6) motion to dismiss when "the defense can either be established from the face of the complaint, matters fairly incorporated within it, and matters susceptible to judicial notice." *Mitchell v. United States*, Civ. Action No. 05–916 (RWR), 2007 WL 148781, at *2 n. 2 (D.D.C. Jan. 16, 2007). "A Rule 12(b)(6) motion tests the legal sufficiency of a complaint...." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C.Cir.2002). In a motion to dismiss for failure to state a claim under Rule 12(b)(6), the complaint must be construed in the light most favorable to the plaintiff and "the court must assume the truth of all well-pleaded allegations." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C.Cir.2004).

## I. REVIVAL OF CLAIM UNDER P.L. 108–108

Congress included in P.L. 108–108 a provision which stated that

> notwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

Pub. L. No. 108–108, 117 Stat. 1241, 1263. Passed in 2003 while this litigation was pending, this trust fund provision serves to stop the statute of limitations period from beginning to run on claims involving losses or mismanagement of Indian trust funds until an accounting has been provided. The defendants argue, however, that this provision in P.L. 108–108 does not apply retroactively to revive a claim for which the statute of limitations has already expired.

 To determine whether a statute applies retroactively, a court "first look[s] for an express command regarding the temporal reach of the statute, ... or, in the absence of language as helpful as that, determine[s] whether a comparably firm conclusion can be reached upon the basis of the normal rules of [statutory] construction." *Lytes v. D.C. Water & Sewer Auth.*, 572 F.3d 936, 939 (D.C.Cir.2009) (internal quotation marks and citations omitted); *see also* (*Fernandez–Vargas v. Gonzales*, 548 U.S. 30, 37, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006)); *Martin v. Hadix*, 527 U.S. 343, 354, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999) (stating that a court looks for an unambiguous directive that the statute should be applied retroactively). "[C]ases where [the Supreme] Court has found truly 'retroactive' [applicability] adequately authorized by statute have involved statutory language that was so clear that it could sustain only one interpretation.'" *INS v. St. Cyr*, 533 U.S. 289, 316–17, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (quoting *Lindh v. Murphy*, 521 U.S. 320, 328 n. 4, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997)). Next, if the statute contains no such express command and a firm conclusion cannot be otherwise reached, the court must determine "whether the new statute would have retroactive effect, *i.e.*, whether it

would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Republic of Austria v. Altmann*, 541 U.S. 677, 694, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). Finally, if the statute has a retroactive effect, a court then looks to whether the general "presumption against retroactive legislation [that] is deeply rooted in our jurisprudence," *id.* at 265, 114 S.Ct. 1483, is overcome because "Congress has clearly manifested its intent to the contrary." *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 946, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). "The 'principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.'" *Id.* at 946, 117 S.Ct. 1871 (quoting *Landgraf*, 511 U.S. at 265, 114 S.Ct. 1483). " 'Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits.' " *AT & T Corp. v. Hulteen*, —— U.S. ——, ——, 129 S.Ct. 1962, 1971, 173 L.Ed.2d 898 (2009) (quoting *Landgraf*, 511 U.S. at 272–73, 114 S.Ct. 1483). Legislative history can be considered when assessing Congress' intention regarding retroactivity. *Lytes*, 572 F.3d at 939–40 ("If applying the statute would have such a disfavored effect, then we do not apply it absent clear evidence in the legislative history that the Congress intended retroactive application.").

The defendants argue that Congress did not prescribe that the trust fund provision apply retroactively to revive a time-barred claim, relying on *Cobell v. Babbitt*, 30 F.Supp.2d 24 (D.D.C.1998). *Cobell* interpreted an earlier version of the Indian trust fund provision which did not contain the language "including any claim in litigation pending on the date of the enactment of this Act." [3] *Cobell* determined that the phrase "shall not commence to run" prevented the statute of limitations clock from commencing, but concluded that that version of the Indian trust fund provision "was [never] intended to do more than its name suggests. In other words, the provision only tolls a clock that has not commenced running. It cannot revive claims for which the clock stopped running long ago." *Cobell*, 30 F.Supp.2d at 44 (considering both the clear language of the earlier provision and its legislative history).

In response, the plaintiffs rely on *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339 (Fed.Cir.2004), which interpreted Consolidated Appropriations Resolution, 2003, Pub. L. No. 108–7, 117 Stat. 11. That law and its predecessor considered by the Court of Federal Claims [4] were enacted while the *Shoshone* litigation was pending, and each contained a provision identical to the one at issue in this case. The Federal Circuit read that provision as preventing the limitations clock for any cause of action for trust fund losses or

---

**3.** The provision at issue in *Cobell* stated " '[t]hat notwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with the accounting of such funds[.]' " 30 F.Supp.2d at 43 (quoting

Department of the Interior and Related Agencies Appropriation Act, 1991, Pub. L. No. 101–512, 104 Stat. 1915).

**4.** Pub. L. No. 106–291, 114 Stat. 922, 939 (2000). *See Shoshone Indian Tribe of the Wind River Reservation, Wyoming v. United States*, 51 Fed.Cl. 60, 63 (2001).

mismanagement from starting until an accounting takes place. *Shoshone*, 364 F.3d at 1347 (concluding that the statute "unambiguously delays the commencement of the limitations period until an accounting has been completed that reveals whether a loss has been suffered"). While *Shoshone* did not specifically discuss revival of an expired claim, or the effect of the phrase "including any claim in litigation pending on the date of the enactment of this Act," *Shoshone* found that the trust fund provision clearly permitted plaintiffs suing in 1979 to assert claims of mismanagement occurring as far back as 1946 despite the expiration of the limitations period existing in 1946. *See Simmons v. United States*, 71 Fed.Cl. 188, 193 (Fed.Cl.2006) (citing *Shoshone* to conclude that P.L. 108–108 "displaces Section 2501 [a statute of limitations] and can resurrect otherwise barred claims" (internal quotation marks omitted)). Other courts have also adopted *Shoshone*'s interpretation that such a trust fund provision delays the start of the limitations clock. *Otoe–Missouria Tribe of Oklahoma v. Kempthorne*, Civil Action No. 06–1436, 2008 WL 5205191 (W.D.Okla. Dec. 10, 2008), interpreted a trust fund provision identical to P.L. 108–108 to "clearly express[ ] an intent to suspend all statutes of limitations until an accounting has been provided." *Id.* at *5 (stating without discussing the phrase "including any claim in litigation pending on the date of the enactment of this Act" that even if there was an ambiguity in reading the statute, the ambiguity should be resolved in favor of the Native Americans and application of any limitations period should be deferred until an accounting is completed); *see also Tonkawa Tribe of Indians of Okla. v. Kempthorne*, Civil Action No. 06–1435, 2009 WL 742896, at *4 (W.D.Okla. Mar. 17, 2009) (relying on *Otoe–Missouria Tribe of Okla.*'s interpretation of P.L. 109–54 to conclude that the plaintiff's claims are not time-barred until an accounting has been furnished).

A statute can contain an express command regarding its temporal scope even if does not contain the word "retroactive." Language in a provision stating that it " 'shall apply to all proceedings pending on or commenced after the date of enactment ... unambiguously addresses the temporal reach of the statute.' " *Martin*, 527 U.S. at 354, 119 S.Ct. 1998 (quoting *Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483); *see also Sadhvani v. Chertoff*, 460 F.Supp.2d 114, 121 (D.D.C.2006) (noting that the amendment was retroactive where Congress stated that the change was "effective immediately and applicable to cases in which the final administrative order of removal ... was issued before, on, or after the date that the ... [original] Act was enacted" (internal quotation marks omitted)). Courts have also found the statutory language that "[n]otwithstanding any other provision of law (including any effective date), the term applies regardless of whether the conviction was entered before, on, or after September 30, 1996" to apply retroactively to change the definition of an aggravated felony under the Immigration and Nationality Act, regardless of the conviction date. *Martinez v. INS*, 523 F.3d 365, 370 (2d Cir.2008); *United States v. Kwan*, 407 F.3d 1005, 1009 (9th Cir.2005).

P.L. 108–108 uses comparable language addressing its temporal scope, at least with respect to the claim at issue in this case, which was pending at the time Congress enacted the provision. The phrase "notwithstanding any other provision of law" operates "to supersede all other laws[, and] '[a] clearer statement is difficult to imagine.' " *Liberty Mar. Corp. v. U.S.*, 928 F.2d 413, 416 (D.C.Cir.1991) (quoting *Crowley Caribbean Transp., Inc. v. United States*, 865 F.2d 1281, 1283 (D.C.Cir.1989)) (second alteration in origi-

nal). The "notwithstanding" language suggests that the trust fund provision was intended to supercede any contradictory statutory provisions, including 28 U.S.C. § 2401(a), which states that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). Taken with the "notwithstanding" language, P.L. 108–108's phrase "shall not commence to run" can be read to supercede § 2401(a)'s time bar, thus not triggering the limitations clock for a cause of action for trust fund losses or mismanagement "until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss." Pub. L. No. 108–108, 117 Stat. 1241, 1263.

Of great importance here is that P.L. 108–108 applies "to any claim in litigation pending on the date of the enactment of this Act." Plaintiffs filed their claim in 2002. When Congress enacted P.L. 108–108 in 2003, the plaintiffs' claim was pending in litigation. Therefore, the statute of limitations "shall not commence to run" on the claim until the plaintiffs have been furnished with an accounting. Even though the language does not contain an explicit directive to revive stale claims, it is identical to the language that the Supreme Court hypothesized would indicate an express command for retroactive application in *Martin* and *Landgraf.* Whether the statutory language applies to stale claims for which no suit was pending when P.L. 108–108 was enacted is an issue that need not be reached here, but Congress has left no ambiguity that the provision applies retroactively with respect to claims pending in litigation when P.L. 108–108 was enacted. *See United States v. Zacks,* 375 U.S. 59, 65–67, 84 S.Ct. 178, 11 L.Ed.2d 128 (1963) (holding that Congress retroac-

tively reopens claims otherwise barred by the statute of limitations when it creates a "grace period" during which the claims can be brought).

Even assuming that no firm conclusion of retroactivity could be drawn in construing the language in P.L. 108–108, applying this provision as plaintiffs suggest would have retroactive effect, and Congress has manifested its intent to overcome the presumption against retroactive legislation. The plaintiffs base their claim on the termination of trust status and resulting asset distribution that took place in the 1950s and 1960s. "Any such claim accrued in 1961 when Interior repudiated its trust relationship with Felter and the other 'mixed-blood' Utes. . . ." *Felter,* 473 F.3d at 1259. Adopting the plaintiffs' interpretation of the provision would revive these claims, which the six-year limitations period in § 2401(a) barred in 1967. *See Hughes Aircraft Co.,* 520 U.S. at 950, 117 S.Ct. 1871 (1997) (describing a cause of action as "moribund" after "the pre-existing period of limitations has expired"). The statute would have a retroactive effect under the plaintiffs' interpretation because the defendants, whose duty, if any, to provide plaintiffs with an accounting ended in 1967, would once again owe the plaintiffs this same duty. *See Altmann,* 541 U.S. at 694, 124 S.Ct. 2240.

Legislative history reveals that Congress intended this retroactive effect. While P.L. 108–108 was passed in 2003, the original version of this Indian trust fund provision was passed in 1990. *Cobell,* 30 F.Supp.2d at 43 n. 20. The legislative history of the original 1990 trust fund provision reflected an intent to

> extend the statute of limitations with relation to Indian trust fund management. Since the audit and [reconciliation] of such funds, as directed by the

Committee, will require at least 5 years to complete, it is possible that the statute of limitations for any significant discrepancies uncovered during this process may have expired by the time such audits are completed. Therefore, the Committee has agreed to provide this extension in order to protect the rights of the tribes and individuals involved should such protection prove necessary. S. Rep. No. 101–534 (1990). Congress' apparent concern at this time was for claims accruing because of discrepancies uncovered during the audit and reconciliation process. Later, in the 1993 version, Congress amended this provision to add "any claim in litigation pending on the date of this Act[,]" which "clarif[ied] that cases in litigation are included under the language." H.R. Rep. No. 103–158 (1993); see also Cobell, 30 F.Supp.2d at 44 n. 23 (citing Department of the Interior and Related Agencies Appropriations Act, Pub. L. No. 103–138, 107 Stat. 1379, 1391 (1993)). The extension of the limitations period in 1993 would "protect the rights of tribes and individuals[,]" and clarified that "cases in litigation are included under the language." H.R. Rep. No. 103–158. The 1993 version of the trust fund provision has been included in subsequent appropriations acts, Cobell, 30 F.Supp.2d at 43 n. 20., including the Omnibus Appropriations Act, 2009, P.L. 11–8, 2009 HR 1105. This legislative history reaffirms the conclusion reached from a plain reading of P.L. 108–108—it revives claims that were stale at the time of the previous provision's passage but were "in litigation pending" when Congress passed it in 2003.

## II. COLLATERAL ESTOPPEL

The defendants argue that even if P.L. 108–108 revives the plaintiffs' claim for an accounting, the claim is barred by collateral estoppel. (Defs.' Renewed Mem. at 12 n.8; Defs.' Suppl. Mem. in Supp. of Defs.'

Renewed Mot. to Dis. at 6–12.) Judgments have preclusive effects, foreclosing relitigation of claims and issues that parties have already had a full and fair opportunity to litigate. Taylor v. Sturgell, 553 U.S. 880, 128 S.Ct. 2161, 2171, 171 L.Ed.2d 155 (2008). It has been "long recognized that '[p]ublic policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest; and that matters once tried shall be considered forever settled as between parties.'" Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 401, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981) (alteration in original) (quoting Baldwin v. Traveling Men's Ass'n, 283 U.S. 522, 525, 51 S.Ct. 517, 75 L.Ed. 1244 (1931)).

Congress may waive the preclusive effect of a "prior judgment entered in the Government's favor on a claim against the United States." United States v. Sioux Nation, 448 U.S. 371, 397, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980). In Sioux Nation, the Supreme Court rejected a separation of powers challenge to the constitutionality of a statutory provision that required the Court of Claims to rehear a claim it previously had rejected. Id. at 391, 100 S.Ct. 2716. The provision stated that "[n]otwithstanding any other provision of law, . . . the Court of Claims shall review [the claim] on the merits, without regard to the defense of res judicata or collateral estoppel[.]" 92 Stat. 153. The Court held that the provision did not raise separation of powers concerns as it did not reduce the Court of Claims' earlier judgment to an advisory opinion, and it did not prescribe a rule for decision for the Court of Claims that would have undermined its adjudicatory function. Sioux Nation, 448 U.S. at 391, 406, 100 S.Ct. 2716 (citing Hayburn's Case, 2 U.S. 408, 2 Dall. 409, 1 L.Ed. 436 (1792), and United States v. Klein, 13 Wall. 128, 80 U.S. 128, 20 L.Ed. 519 (1871)).

However, given the separation of powers concerns inherent in Congress ordering federal courts to revisit judgments previously thought final, the Supreme Court has since suggested that parties' ability to waive the preclusive effect of prior judgments is limited. *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 231, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (noting that while "waivers of res judicata [by litigants] are [not] always impermissible, . . . waivers of res judicata need not always be accepted"); *see also Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (stating that when "Article III limitations are at issue, notions of consent and waiver [by parties] cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect").

Because the prospect of waiving the preclusive effects of a prior judgment raises serious constitutional questions with respect to a court's Article III powers, statutes should be construed, if possible, not to have this effect. *See Machinists v. Street*, 367 U.S. 740, 749–50, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) (noting that "if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided") (internal quotation marks omitted). Unlike the statute at issue in *Sioux Nation*, which referred specifically to the defenses of res judicata and collateral estoppel, P.L. 108–108 is capable of a construction that does not have the potential effect of reducing an Article III court's decision to an advisory opinion or undermining a court's adjudicative function. Even though it applies "notwithstanding any other provision of law," P.L. 108–108 does not specifically or unequivocally waive the preclusive effect of prior judgments. Accordingly, "notwithstanding any other provision of law" should not be construed to allow plaintiffs to bring their claim for an accounting if a prior decision forecloses that possibility. *See NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 500, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (noting that when a particular interpretation of a statute would raise separation of powers questions, "there must be present the affirmative intention clearly expressed" to adopt that interpretation).

■■■ Collateral estoppel "forecloses 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor*, 128 S.Ct. at 2171 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)). " 'When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.' " *Consolidated Edison Co. of N.Y. v. Bodman*, 449 F.3d 1254, 1258 (D.C.Cir. 2006) (quoting *Fogg v. Ashcroft*, 254 F.3d 103, 111 (D.C.Cir.2001)). The party against whom issue preclusion is invoked must have had an incentive to fully litigate the issue in the first proceeding, so that preclusion does not "work a basic unfairness to the party bound by the first determination". *Yamaha Corp. of America v. United States*, 961 F.2d 245, 254 (D.C.Cir. 1992). Although collateral estoppel typically operates to bind the parties to the previous suit only, it may also bind a nonparty if the issue was decided in a suit brought by a party acting as "a fiduciary representative for the beneficial interest of the nonpart[y]." *Sea–Land Servs. v. Gaudet*, 414 U.S. 573, 593, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974).

The plaintiffs claim that they are entitled to an accounting because the defendants mismanaged trust funds to which the plaintiffs assert they are entitled. (Am. Compl. ¶¶ 106–12.) This claim rests on the premise that the defendants are "charged with carrying out the trust obligations of the United States" (*id.* ¶ 109), as the defendants could not have mismanaged assets for which they were not responsible. Although the Secretary of the Interior's proclamation, published in the Federal Register in 1961 as provided for in the UPA, purported to terminate the federal trust relationship to mixed-blood property, 26 Fed. Reg. 8042–03, the plaintiffs assert that the termination was ineffective because the UPA was never implemented as intended by Congress. (*Id.*)

However, in *Affiliated Ute Citizens,* the Supreme Court recognized that the UPA had been implemented as intended by Congress. The UPA authorized the mixed-bloods to organize and adopt a constitution. 25 U.S.C. § 677e. Under this provision, the mixed-bloods organized an unincorporated association, the Affiliated Ute Citizens of the State of Utah ("AUC"). *Affiliated Ute Citizens,* 406 U.S. at 135–36, 92 S.Ct. 1456. The UPA also authorized the mixed-bloods to select "authorized representatives with power 'to take any action that is required by [the UPA] to be taken by the mixed-blood members as a group[.]'" *Id.* at 135, 92 S.Ct. 1456 (quoting 25 U.S.C. § 677e). Under this provision, the mixed-bloods incorporated the Ute Distribution Corporation ("UDC") to manage the indivisible assets of the mixed-bloods, and the UDC issued shares of stock. *Id.* at 136, 92 S.Ct. 1456. Eighty-five mixed-bloods sold their shares and then sued various defendants involved in the transaction, including the United States, claiming that the sale violated the Securities and Exchange Act of 1934. *Id.* at 144–45, 92 S.Ct. 1456. The Supreme Court granted certiorari in the securities case, *Reyos v. United States,* 431 F.2d 1337 (10th Cir.1970), and consolidated it with a related case in which the Court had also granted certiorari, *Affiliated Ute Citizens v. United States,* 431 F.2d 1349 (10th Cir.1970), which raised the issue of whether the UDC or the AUC was the authorized representative of the mixed-bloods for the purpose of distributing pro-rata shares of a mixed-blood mineral interest. *Affiliated Ute Citizens,* 406 U.S. at 141, 92 S.Ct. 1456. The Court held that the 1961 proclamation by the Secretary had terminated federal control over the divisible mixed-blood assets, which included shares of the UDC stock, and that the United States could not be held liable for failing to restrain the sale because "there was no remaining governmental authority over those shares." *Id.* at 150, 92 S.Ct. 1456.

■ This holding resolved the issue the plaintiffs are now attempting to litigate. In the present case, the plaintiffs claim that the UPA did not terminate the government's trust obligations over the ICC judgment. *Affiliated Ute Citizens* determined that the UPA did effectively terminate the federal trust status of the mixed-blood divisible assets, and this certainly includes their share of the ICC judgment—an amount in dollars that the mixed-bloods could separate and distribute as they saw fit. The parties actually litigated this issue in *Affiliated Ute Citizens,* and the Supreme Court actually decided it. The determination was essential to the judgment, as there was no other basis upon which the court could have concluded that the United States was not liable for failing to restrain the sale, and this gave the plaintiffs an incentive to fully litigate the issue at the time.

■ "Generally speaking, one whose interests were adequately represented by

another vested with the authority of representation is bound by [a previous] judgment, although not formally a party to the litigation." *Ellentuck v. Klein*, 570 F.2d 414, 425–26 (2d Cir.1978) (quoting *Expert Elec., Inc. v. Levine*, 554 F.2d 1227, 1233 (2d Cir.1977)). AUC brought suit in *Affiliated Ute Citizens* "as representative of its 490 mixed-blood members[.]" 406 U.S. at 139, 92 S.Ct. 1456. As mixed-bloods or descendants of mixed bloods, the plaintiffs in this case are in privity with AUC, as they had their interests adequately represented by AUC in *Affiliated Ute Citizens*, since any judgment in AUC's favor would have conferred a financial benefit on each of its members.[5] Although AUC was not a named plaintiff in the companion *Reyos* case, all the plaintiffs in that case were members of AUC, the same lawyer represented the parties in both of the cases, and AUC funded the *Reyos* suit. *Murdock v. Ute Indian Tribe of Uintah and Ouray Reservation*, 975 F.2d 683, 689 (10th Cir. 1992). The Tenth Circuit, in determining that *Affiliated Ute Citizens* collaterally estopped mixed-blood plaintiffs from contesting that the UDC was the authorized representative of the mixed-bloods for the purpose of managing indivisible Ute assets, concluded from these interconnections that the "AUC was in privity with the *Reyos* plaintiffs." *Id.* The plaintiffs here, then, are bound by the resolution of the trust issue even though they were not named parties in the prior suit because the *Affiliated Ute Citizens* plaintiffs were act-

ing as their fiduciary representatives and for their benefit. Since the plaintiffs are precluded from arguing that the federal government was responsible for holding the ICC judgment in trust after the Secretary of the Interior's proclamation terminated the trust relationship, there are no assets for which the defendants are required to account, and the plaintiffs cannot state a claim upon which relief can be granted.

## CONCLUSION

Although P.L. 108–108 did revive at the time of its enactment time-barred claims then pending in litigation, it did not waive the preclusive effects of prior judgments, and the plaintiffs are collaterally estopped from arguing that the defendants had an obligation to supervise in trust the plaintiffs' share of the ICC judgment. The plaintiffs therefore cannot demonstrate that they are entitled to an accounting, and the defendants' motion to dismiss will be granted. A final order accompanies this Memorandum Opinion.

---

**5.** There are certain individual plaintiffs named in the complaint who were neither mixed-bloods nor descended from mixed-bloods. To the extent that these plaintiffs were not in privity with the AUC, which only purported to represent the interests of the 490 mixed-bloods in *Affiliated Ute Citizens*, such that these plaintiffs are not bound by the court's determination that the government's trust obligations over the ICC judgment had been terminated, the complaint will be dis-

missed with respect to them under Fed. R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. These plaintiffs lack standing because they are not owed any part of the mixed-blood share of the ICC judgment and cannot allege an injury-in-fact that would be redressed by an accounting of the portion of the judgment owed to the mixed-bloods. *See Wright v. Foreign Serv. Grievance Bd.*, 503 F.Supp.2d 163, 171 (D.D.C.2007).